THE TEXAS COMPANY v. JOE BURKETT.

No. 4087. Decided June 4, 1927.
(296 S. W., 273).

18

*H. S. Garrett (C. B. Ames, Robt. A. John* and *J. T. Lauhon,* of counsel), for plaintiff in error.

For the year beginning September 24, 1920, the plaintiff attempted to make a parol sale of land and such attempted conveyance was inhibited by Art. 1103, Revised Statutes, and recovery thereon was prohibited by Art. 3965, Revised Statutes. Hence plaintiff is not entitled to recovery herein and the Court of Civil Appeals erred in refusing to so hold. Arts. 1103 and 3965, Rev. Stats. of Texas; McGee Irrigation Ditch Co. v. Hudson, 85 Texas, 587; Ryan v. Wilson, 56 Texas, 36; Garner v. Stubblefield, 5 Texas, 552; Lodge v. Leverton, 42 Texas, 18; Patton v. Rucker, 29 Texas, 402; Muller v. Landa, 31 Texas, 265; Foster v. N. Y. & T. Land Co., 22 S. W., 260; 2 Kinney on Irr. and Water Rights, Sec. 769; 1 Wiel on Water Rights, Sec. 283.

The Leon River is not a watercourse. Hence plaintiff acquired no rights in or title to the waters thereof as a riparian owner and having no rights or title by appropriation or prescription, had nothing to convey and may not recover. Hoefs v. Short, 114 Texas, 501; Lamb v. James, 87 Texas, 485.

The alleged oral contract of the plaintiff by which he attempted to sell to the defendant the waters of the Leon River or any rights therein was nugatory, unenforcible and afforded no basis for the recovery by plaintiff of the alleged consideration for such contract for that the plaintiff did not purport to sell to defendant the land abutting the said stream and claimed to be owned by plaintiff, the ownership of which land was necessary to carry ownership of or rights in the waters of the stream. That is to say, plaintiff could not convey the waters without conveying the land. Richter v. Granite Mfg. Co., 107 Texas, 508.

The alleged verbal contract by which the plaintiff attempted to sell the waters of the Leon River to be used for commercial and artificial purposes on lands not riparian to said "stream" and not within the limits of the original grant from the sovereignty of the

soil of the land claimed to be owned by the plaintiff and abutting said stream by virtue of which land his rights, if any, in and to said water obtained as a riparian proprietor, was inconsistent with such rights as riparian owner, not authorized thereby, void and of no effect. Hence plaintiff was not entitled to recover the alleged consideration for such contract. Watkins Land Co. v. Clements, 98 Texas, 578; Gordonsville v. Zinn, 129 Va., 542, 106 S. E., 508, 14 A. L. R., 318, and note.

*Burkett, Orr & McCarty* and *Conner & McRae,* for defendant in error.

Mr. Chief Justice CURETON delivered the opinion of the court.

Joe Burkett brought this suit in the District Court of Eastland County against The Texas Company to recover the sum of $5,000 and interest, alleged to be due him as the agreed consideration for the right and privilege of taking and using certain waters, hereafter to be described, of erecting pumping plants on and laying pipe lines over his lands, and for damages incident to the exercise of the privileges and rights granted. The original contract was in writing, and extended one year from and after September 24, 1919. He alleged a written contract entered into with the company on September 24, 1919, through its agent, J. E. Rees, for an agreed consideration of $5,000, which was paid; and that at the time of the execution of the written contract it was verbally understood and agreed between him and Rees, acting for the company, that the company should have the option and right, at or before the expiration of said year term, to extend the contract for a similar consideration for another year. He alleged, and the jury found, that the contract was extended in June, 1920. He stated that on inquiry by him of Rees whether or not the company desired to exercise its option and contract for said water for another year, Rees said to him that the company was desirous of using the water for another year, and that he, the plaintiff, need not look any further towards selling the water, and to consider the contract closed. He subsequently saw Rees, by whom he was informed that the company desired to exercise its option, and to consider the contract closed for the use of the water for the second year; to which the plaintiff assented, for the same consideration stated in the original agreement. The Texas Company answered by general and special exceptions and general denial, and alleged on September 24, 1919, that the plaintiff did by means of a written deed attempt

to sell to it said waters, but that the deed expired by its own terms on September 24, 1920, and that on August 16 and August 20, 1920, it gave plaintiff notice that the contract would expire as above, and denied that it ever attempted to make a contract for the use of the water other than the written one. It denied plaintiff's right to sell the said water for commercial use on non-riparian land, alleged that the oral option and contract sued upon were unlawful, contrary to public policy, wanting in mutuality, without consideration, and unenforcible; that the water involved was the property of the State, and not subject to private contract; that if the plaintiff owned the water or right therein, such right was real estate or interest in land, and that by reason of the Statute of Frauds plaintiff could not maintain the suit or recover. It also denied that Rees had authority to make such optional agreement or contract for defendant, and declined to be bound thereby. Both parties pleaded other matters, which we think unnecessary to state, except that the plaintiff pleaded estoppel as against the company's contentions in various forms.

On special issues submitted the jury found:

1st. At the time the parties entered into the written contract, it was agreed that the company should have an option or right to extend the same for a second year beginning September 24, 1920, for which the company was to pay Burkett the additional sum of $5,000.

2nd. The Texas Company, through its representative, J. A. Rees, prior to the expiration of the written contract, exercised its option to extend the term of the written contract, and agreed to pay Burkett therefor the sum of $5,000.

3rd. It was within the authority or scope of the apparent authority of Rees to exercise the option to extend the term of the written contract for the second year.

This judgment was affirmed on appeal to the Court of Civil Appeals (255 S. W., 763).

The case is here by writ of error.

The written contract referred to was signed and acknowledged by Joe Burkett, and signed by The Texas Company by J. A. Rees. Under this contract, in consideration of $5,000 paid by the company, Burkett granted to it "the right and privilege to take and use all the water in the Leon River," upon the lands described in the instrument. Continuing, the contract reads as follows:

"That the term of this grant is for a period of one year from the date of the execution hereof, and grants unto The Texas Company

the exclusive privilege in and to all of the water in the Leon River upon the above described premises, save and except the lessor reserves sufficient water for drilling operations upon his own land should drilling actually begin thereon.

"That The Texas Company may erect and maintain pumps, pump stations, and necessary buildings and equipment on the land, and may lay pipe lines for the purpose of carrying fuel and water upon said land, and removing and pumping water from said river, and may install engines and telephone lines and posts, and all other necessary equipment, machinery and fixtures necessary under the terms of this contract, and may pump from said Leon River all said water and all that may be impounded in said Leon River upon the above described premises during the term of this grant, and the above named consideration not only pays for the exclusive right to use water from the Leon River, but also pays for all damages to crops, fences and grasses that may be occasioned by its laying pipe lines over and through said lands.

"That The Texas Company shall have the right to locate its pump station or stations, and remove water from the river at any place it deems proper, and also the right, should it become necessary, to excavate on the banks of said river for the purpose of getting access to any underground streams.

"At the termination of this contract, The Texas Company may remove all property placed by it on said land, whether affixed to the realty or not, and shall have a reasonable time within which to do so.

"The Texas Company shall have and is hereby granted the right of ingress and egress for all purposes, and especially to make inspections, repairs, and to operate such water plant.

"It is further understood and agreed that in consideration of the cash so paid on the delivery hereof, we, the grantors herein, hereby declare our acquiescence, approval and consent of the act of the said company in exercising its rights as above set forth.

"To Have and to Hold, all and singular, the above rights, easements and privileges herein granted to The Texas Company, and we, the grantors herein, do hereby warrant the said The Texas Company, in the quiet and peaceable possession of the above described premises for and during the term of this grant."

Rees and Burkett, prior to the time of the execution of the contract, went upon the ground. The visible water dam and other features of the land involved were pointed out, including the places where springs existed and generally the status of the land as water-producing soil.

In order, therefore, that we may have in mind clearly just what the company was contracting for we will direct attention to the land described for water-producing purposes. Speaking with reference to this feature, the plaintiff Burkett, among other things, testified:

"The south prong of the Leon River runs through that piece of land. That stream does not contain running water all the time, except in flood-time.

"Prior to this contract, I had constructed a dam, something to catch water in the creek. I built a roadway, which made the dam, and it was made out of rock and concrete, limestone and concrete. That was completed on the 4th day of July, 1917. The contract is dated September 24, 1919.

"Under my contract with The Texas Company, that company erected a pumping plant; they placed two pumps above the dam—first, I believe they placed one pump above the dam and placed one pump down the river something like 200 or 300 feet, at the spring, where there is a spring in the creek, and they also erected a house and laid a water line across my place, northeast across my place, also laid a gas line across my place.

"That spring below the dam was there all the time. It has never been dry since I have owned the place, since 1912.

\* \* \* \* \* \*

"I went out with Mr. Rees alone the first time we went out on the premises. There wasn't very much water in the creek above the dam, but I took Mr. Rees down where this spring was and told him that there was an abundance of water there. In case of dry weather, when all of the surface water was gone, that there was lots of water there that could be had by scraping out the filling-in of the creek bed there. \* \* \* We drove down through the alfalfa patch and stopped the car, and I went with him and told him about the spring there in the creek—the creek had water in it then—that if the creek should go dry, that there was an abundance of water that could be had; that it had never been dry. I also told them about digging a well right on the bank of the creek, and about there being an abundance of water there, and another well about fifty or seventy-five feet further east, and there was an abundance of water there. And I also told them about digging a well in the bed of the creek about fifty yards down the creek, and that they found water there, and that there was water there in abundant quantities in case they used up all of the water in the creek.

\* \* \* \* \* \*

"The Leon River, so-called at that point, is a running stream only in flood times. In wet weather it runs some, but it soon dries up.

\* \* \* \* \* \*

"Sometimes the Leon River doesn't run for as much as six or eight months. It is impossible for me to say when it is going to run and when it is not.

\* \* \* \* \* \*

"I have known that spring that they testified they couldn't find since 1912. I know what we refer to as the three-year drouth, 1916, 1917 and 1918. That spring and the well that was dug about fifty feet upon the bank from it, furnished water for 150 head of hogs and about sixty head of horses and cattle, and was never low; it seemed to be the same all the time.

\* \* \* \* \* \*

"I hired that well dug, and it was nine feet square. John Webb dug the well and we had the well curbed; I put the curbing in myself. The well was dug down nine feet square, and after we struck the water I employed two men with a windlass and they had two five-gallon cans to pump the water out. The well was there at the time, and that was the well I showed Mr. Rees. The well was there, filled up, and I told Mr. Rees and told this other gentleman about this well being there, and about this well having been dug and the quantity of water it would supply if cleaned out. It was within ten feet of the bank of the creek where this spring comes out, and it was impossible to exhaust the water with two five-gallon cans going on the windlass continually.

"I told them that this well and this spring was on north of the north line of the eighty-acre tract. It was about three hundred feet over on the George Haig survey, and gave them the privilege of coming down there and using water there if necessary. That was on an entirely different survey.

"Going over the ground and showing these men the property, I took them to this well and this spring and showed them right where they could get water. That was part of the contract, and I gave them permission to use water there."

S. M. Richardson, who had lived in the neighborhood of the Burkett place, and had occasion to visit it since about 1900, and had lived on the place during dry seasons, in part testified:

"I know about the spring and water supply there in the creek northeast of the house, near where some wells were dug. That water in

the creek there was never dry while I was there, or while I have known that place. I was familiar with the wells dug adjacent thereto. I don't believe we ever exhausted any of those wells so we could tell just how much water supply there was there. I suppose there was two or three feet of water sand there. There was just a sheet of water, the awfulest sheet of water that I ever witnessed.

*　　*　　*　　*　　*　　*

"I have pumped water for drilling rigs. I have been in that business, up until about the last of June, for about three and one-half years. During that time I suppose I have supplied about one hundred and fifty rigs with water for drilling purposes. I am familiar with the amount of water used by a drilling rig. * * * As to how many wells could be supplied from that water there, I believe that would depend on how many wells were put down. But in my own estimation, I believe half of this field could have been furnished water from that farm, for all reasonable drilling purposes, from the underground water supply, from the wells. * * *

"That spring I mention is just below one of the dams. There were two dams. There is a spring above one dam and below the other. One of the dams was a causeway crossing the river going to the house. The spring is below that one. The large spring is just below the dam. There are two or three small springs up and down that creek, but the large spring was below there. There is usually water above that dam. The larger spring was below that causeway. That is the dam that has a crossing over it, a sort of a causeway. These two wells that I spoke of were dug, I suppose, about the year before I went there, and I went there, I suppose, about 1917. There were about three wells."

The testimony just quoted plainly shows that an abundance of water could be obtained from the Burkett land of four different types or from four different sources: First, the waters of the ordinary flow of the stream when it did flow; second, storm and flood waters, when such were in existence, or when caught in Burkett's reservoir made by his dam; third, the underground flow of the stream through the gravel and sand beneath the surface, when it was not flowing over the surface of its bed; fourth, percolating waters from Burkett's land, obtainable either at the outcropping springs or by excavations on the banks down to the level of the general water table for that immediate vicinity.

It is obvious from reading the contract that its general terms are

sufficient to embrace water of all these types or from all these sources. The contract purports to grant "the exclusive privilege in and to all the water in the Leon River upon the above described premises," with a certain reservation for the grantor's own use. The contract also declares that The Texas Company shall have the right, "should it become necessary, to excavate on the banks of said river for the purpose of getting access to any underground streams." One of the attacks made upon this contract by The Texas Company is that it purported to grant waters which Burkett had no ownership in, and that therefore the consideration failed, and the contract was void as against public policy.

From the testimony shown in the record we are of the opinion that Leon River is a stream to which riparian rights attach, and the flood waters of which are subject to the appropriation laws of this State. Hoefs v. Short, 114 Texas, 501, 273 S. W., 785, 40 A. L. R., 833.

The right of Burkett as a riparian owner was one of use only, since the riparian does not own the water which flows past his land. Long on Irrigation, Sec. 34; Kinney on Irrigation (2d Ed.), Vol. 1, Secs. 455, 456.

It is also a general rule that a riparian owner has no right to divert riparian water to non-riparian land. Long on Irrigation, Sec. 49; Kinney on Irrigation (2d Ed.), Vol. 1, Sec. 517.

It is, however, the rule, which we think applicable in this State, that the riparian owner has the right to divert riparian water to non-riparian lands where water is abundant and no possible injury could result to lower riparian owners. Long on Irrigation, Secs. 49, 51; Watkins Land Co. v. Clements, 98 Texas, 578, 585, 86 S. W., 733, 70 L. R. A., 964. See also Elliott v. Fitchberg R. R. Co., 10 Cush., 19, 57 Am. Dec., 85; Narbury v. Ketchin, 7 Law Times (N. S.), 685.

It is quite true that a riparian owner can not grant the use of his riparian water to lands which are non-riparian. But this is so only to the extent that he can not grant such a use to the detriment of other riparian proprietors. "As against himself or his grantee, a riparian owner may contract for the diversion of the water to non-riparian lands, but the rights of inferior proprietors will not be affected by such contract." Long on Irrigation, Secs. 49, 174, 176. Apparently it is only a prejudicial diversion of water which is prohibited by the statutes of this State. (Vernon's Texas Civ. Stats., 1918 Supp., Art. 5011b.) But the riparian owner has the right to contract for the use of his proportionate share of riparian water

on riparian lands. Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; Kinney on Irrigation (2d Ed.), Vol. 1, Secs. 535, 529; Long on Irrigation, Secs. 174, 176.

The case of Richter v. Granite Mfg. Co., 107 Texas, 58, 174 S. W., 284, L. R. A., 1916 A, 504, relied on by the plaintiff in error, is not controlling on the question of the validity of the contract here involved. There the attempted reservation from the grant of the ground "necessary to utilize the water power" was so vague as to be incapable of enforcement, and this court held that the attempted reservation was repugnant to the grant and void. Had the deed reserved a definite area of land riparian to the stream for water power purposes, we have no doubt this court would have sustained the reservation. We think it a matter of common knowledge that during dry seasons riparians lease the right and use of their waters for ordinary purposes, and to say they can not make valid agreements of this character without granting the land is not only repugnant to general custom, but to common sense as well. Of course, if the rights of other riparians are trespassed upon, a different question arises, but no such issue is here involved. Mr. Kinney in his able work on Irrigation, supra, lays down the correct rule, as follows:

"In general it may be said that the use and occupancy of the water may be granted separate and apart and thus severed from the upland. There is no question upon this point where the right of use is granted for the purpose of operating power or other plants along the stream and where the water is not consumed. In such a case the grantee must exercise the rules of reasonable use, discussed in previous sections of this part, taking into consideration the rights of the riparian owners below; and, as we have seen, one element of this reasonable use is to return the water to the stream before it reaches the riparian lands of those below, practically undiminished in quantity, and undeteriorated in quality, in order that they may be permitted to make a like or other use of the water to which they are entitled. In such cases, all the parties to the grant are bound in accordance with its terms; and the other riparian owners upon the same stream, who are not injured, can not object simply upon the ground of the change of ownership of the use above. As far as all practical purposes, therefore, are concerned all parties upon the stream are bound by such a conveyance.

"Again, there seems to be no question but that one riparian proprietor may grant to another riparian proprietor upon the same stream the right to the use of the water or a certain amount of the water

included in the grantor's riparian rights, and even if the grantee consumes the water or a reasonable proportion thereof, and no one is injured by the change of ownership or the change in place of use, such grant practically binds all the riparian owners upon the stream. It binds the parties to the grant according to its terms; and it binds the other riparian owners, because they are in no position to object to the change of ownership or the change of use. Again, where there is but one riparian owner, as would be the case where the entire length of the stream is upon the lands of one person, he may grant all of the riparian rights to the use of the waters of such stream, even if by that use it is all consumed by the grantee. This is for the reason that the grantor had dominion and ownership of it. It was his property and he could dispose of it as he saw fit. Again, where all the riparian owners upon the stream join in such conveyance, no question can arise as to the use of the water by any grantor, unless such use should be reserved by him.

"But upon the other hand, where a grantor grants his riparian right to the use of the water of a stream for the purpose of some use where the water is wholly or partially consumed, as, for example, would be the case for the irrigation of non-riparian lands, or to supply a municipality and its inhabitants with water, and the rights of the other riparian owners on the stream are materially and substantially injured by such a diversion and use made by the grantee, the grant, while binding between the immediate parties to the same, and their successors in interest, is not binding upon non-contracting riparian owners." Kinney on Irrigation, Sec. 535.

It is to be noted that in the contract before us Burkett had made no agreement as to what land such riparian water as might be taken should be used upon, and we will not indulge in the presumption that the contracting parties contracted that an unlawful use would be made of it. He plainly had the right to contract for the use of his riparian water on land riparian to Leon River, which ran through the extensive oil fields in which The Texas Company was operating. Whether or not The Texas Company had in fact any land riparian to the river, we do not know, nor is it a matter of consequence. If it either had or did obtain land riparian to the river, it could have lawfully used the riparian water obtained from the Burkett land. We think it also clear that Burkett had the right to contract for the use of water obtained from his land on non-riparian land, so long as the supply was abundant and no injury resulted to lower proprietors. Whether or not in order to do so a permit from the State would have

been necessary, we do not decide, since the uncontradicted evidence in this case shows that Burkett offered to obtain a permit from the State if The Texas Company desired it, and they did not desire it or accept the offer.

What has been said with reference to riparian water flowing on the surface of the bed of the stream applies with equal force to riparian water, if any, which might flow through the sand and gravel beneath the surface of the bed of the stream.

The flood waters of a stream are those waters above the highest line of ordinary flow of the stream, as defined by this court in the case of Motl v. Boyd, 116 Texas, 82, 286 S. W., 458. As to these waters, it is obvious that Burkett had not obtained a permanent water right in the sense that that term is used in the statutes. But he would have done so had The Texas Company desired it, since, as we have shown, he offered to obtain a statutory permit. By virtue of the contract The Texas Company obtained access to the stream and to the reservoir constructed by Burkett, as well as sites for its pumping plants and right of way or easement for its pipe lines. Having access to the stream, and having all the rights which Burkett had in and to the reservoir made by his impounding dam, The Texas Company itself was in position to apply to the Board of Water Engineers for the appropriation of storm and flood waters which the stream might carry, or which might be impounded in the reservoir. The statute expressly provides that these waters may be appropriated not only for irrigation purposes, but for mining purposes as well. Vernon's Texas Civ. Stats., 1922 Supp., Art. 4993, 1918 Supp., Arts. 4994, 5002b. It is obvious, then, that in so far as this class of waters is concerned, The Texas Company obtained very valuable rights, to-wit: Access to the stream; access to and use of Burkett's reservoir; sites of its pumping plants; easement for its water lines across his land—and was in position, therefore, to have obtained and made use of a permit from the State, if it desired to do so. It was lawfully entitled to such permit, and there is no pretense that it could not have obtained the same, or that Burkett could not and would not have obtained it for the company, if desired. It is plain, too, that under the contract the company obtained access to the springs made by percolating waters coming out of the banks of the stream. We are unable to say, from the evidence, whether or not the spring, or springs, from these percolating waters, was, or were, of sufficient magnitude to be of any value to riparian proprietors, or added perceptibly to the general volume of water in the bed of

the stream, and we therefore assume that they were springs of such character that Burkett plainly had the right to grant access to them and the use of their waters for any purpose, either on riparian or non-riparian land. In other words, in so far as this record discloses, they were neither surface water nor subsurface streams with defined channels, nor riparian water in any form, and therefore were the exclusive property of Burkett, who had all the rights incident to them that one might have as to any other species of property. Long on Irrigation, Secs. 47, 45.

The record shows that the clause placed in the contract giving The Texas Company authority to excavate on the banks of the river for the purpose of getting access to underground waters was placed there after its agent had been informed as to the readily accessible water underground, and after he had in fact seen excavations previously made for such purpose. There is no evidence in the record that the waters to be thus obtained by excavation were underground streams with defined channels, and therefore possibly within the rule invoked in some jurisdictions that the use thereof was a limited or correlative one. Long on Irrigation, Sec. 43. In the absence of such testimony, the presumption is that the sources of water supply obtained by such excavations are ordinary percolating waters, which are the exclusive property of the owner of the surface of the soil, and subject to barter and sale as any other species of property. Long on Irrigation, Secs. 45, 47.

From the foregoing we think it evident that when this contract was entered into Burkett had something to sell, and when the company accepted the contract and paid the consideration therefor it obtained very substantial rights of great value to it, of which it made a valuable use for the twelve months' period of the original contract's existence. That Burkett's water rights, whether complete or incomplete, whether riparian or of a potential appropriator, his dam, location, easements, etc., were all the subject of sale or lease, is well sustained by the authorities. Long on Irrigation, Sec. 174, and cases in the notes.

We find nothing unlawful in this contract. The fact is that, in so far as this record discloses, no prosecution was brought against The Texas Company, and no injunction suit filed against it, as authorized by law for the unlawful use or diversion of water. Vernon's Texas Crim. Stats., 1918 Supp., Arts. 837a, 837i; Civil Stats., Art. 5011b; Santa Rosa Irr. Co. v. Pecos River Irr. Co., 92 S. W., 1014. And rather than indulge the fancy that the plaintiff in

error itself was guilty of violating the law, we would presume it contracted for a lawful use of the water, and in that use obeyed the law, regardless of what the requirements of the statute may have been. We think the contract, therefore, a valid contract, based upon ample and sufficient consideration, and therefore enforcible.

Giving the contract in this case the meaning which we have given it, we think it is one affecting real estate to such an extent as to be within the Statute of Frauds. Long on Irrigation, Sec. 177; Hayes v. Fine, 91 Cal., 391, 27 Pac. 772; Churchill v. Russell, 148 Cal., 1, 82 Pac., 440; Bree v. Wheeler, 4 Cal. App., 109, 87 Pac., 255; Bullerdick v. Hermsmayer, 32 Mont., 541, 81 Pac., 334.

We are equally clear that under the facts of this case it is taken out of the Statute of Frauds by full performance of the contract on the part of Burkett, by part performance of the contract on the part of the company, and by reason of the fact that Burkett has been induced and allowed to alter his position on the faith of the oral extension of the contract, as found by the jury, to such an extent that it would be fraud on him to permit The Texas Company to set up its invalidity. Long on Irrigation, Secs. 177, 178, and cases cited in the notes; Churchill v. Russell, Bree v. Wheeler, supra; see also Motl v. Boyd, 116 Texas, 82, 286 S. W., 458, and cases cited post.

The finding of the jury shows that at the time the written contract was entered into Burkett agreed that the company should have the option or right to extend the contract for another year from the date of such expiration, on the payment of $5,000, and that prior to the expiration of the contract it was extended by Rees, the representative of the company. The evidence shows that during the months of May, June, and July, 1920, water was scarce in the Eastland oil field; that the Magnolia Petroleum Company was extensively engaged in drilling operations near Eastland during said months and prior thereto, and required a considerable amount of water for its drilling operations; that it was in need of water, and was using every effort to secure an additional supply. For this purpose its representative called on Burkett and endeavored to get the identical water privilege which The Texas Company at that time enjoyed by virtue of the contract here in controversy. The witness Johnson testified that he tried to purchase the water right from Burkett for the Magnolia Company. In part he said: "I did not merely express the opinion to Joe Burkett that the Magnolia Company might take the water. We needed water, and I was trying to arrange for an additional

supply. It is a fact that we never did agree with Mr. Burkett to take the water. He wasn't in shape to let us have it. Therefore we did not enter into a contract." Burkett's testimony, as well as Johnson's, leaves no room for doubt that but for the fact that The Texas Company had, through Mr. Rees, exercised its option to take the water involved in this controversy for another year, Burkett could have sold the privilege to the Magnolia Company. In other words, it is plain, we think, from the evidence, that the action found to have been taken by Mr. Rees of extending this contract deprived Burkett of making a sale of his water right privileges. The evidence shows that when Burkett made the extension agreement with Rees, Rees was told that if he was not sure that The Texas Company would take the water privilege at the end of its contract period, Burkett had a chance to sell it to the Magnolia Company, and he desired to know whether or not The Texas Company was going to exercise its option. Upon this state of facts Mr. Rees exercised the company's option to take it for another year, saying: *"You need not look any further. You can consider that we will take it for the second year."* This extension was somewhere about the middle of June, 1920. After July, 1920, oil development materially decreased, causing a less consumption of water. The undisputed evidence shows that the decrease in drilling activities was fully fifty per cent after July, 1920, and, as a natural consequence, the consumption of water for this purpose decreased fully fifty per cent. Prior to August, 1920, there had not been much rain that year, but the undisputed evidence shows that beginning about the middle of August "there was an abundance of rain, and extending up into September." On August 16, 1920 (which is about the middle of August), the following letter was received by Burkett:

"No. 18372—Joe Burkett Water Contract
Eastland County, Texas.

Cisco, Texas, August 16, 1920.

Mr. Joe Burkett,
Eastland, Texas.
Dear Sir:

This is to advise you that we will forfeit our water contract with you on expiration date of same.

Yours very truly,
THE TEXAS COMPANY,
By H. M. Anderson, General Supt. R."

After the receipt of this letter, on August 18, Burkett replied

thereto, in which he told the company of his previous conversation with Rees, the company's agent, in which the option to take the water contract for another year was exercised by the latter. In that letter Burkett said:

"At that time I had a chance to lease the same to the Magnolia people in case the Texas people did not want it, but upon Mr. Rees telling me that The Texas Company would want it I made no further effort to lease same and I am expecting to hold your company to the contract."

After the receipt of the letter above quoted from The Texas Company, Burkett tried to sell the water rights and privileges of getting water to other companies, but did not succeed, and did not obtain any revenue from his water during the succeeding year.

In this case Burkett completely performed his contract, treating the contract as being the written instrument in evidence together with the oral option or privilege of extending it, and as having been extended as found by the jury, by delivering the premises to The Texas Company and keeping faith with the warranty at the close of his contract, which we have quoted, to the effect that Burkett warranted the company "in the quiet and peaceable possession of the above described premises for and during the term of this grant." That grant extended definitely by the terms of the contract for one year from its date, and then under the terms of the option for another year, if the option was exercised and the jury found that it was exercised. After the delivery of possession of the premises, nothing more remained for Burkett to do. He had completed his part of the agreement, including the option. The Texas Company, on the other hand, had gone into possession of the premises, occupied the ground, laid its water pipe lines, built its pump houses, and enjoyed every right authorized or permitted by the contract, had paid the $5,000 for the first year's period, and by the exercise of its option deprived Burkett of his opportunity and right to lease his water to other parties.

The general rule is that where one party to an oral contract has in reliance thereon so far performed his part of the agreement that it would be perpetrating a fraud on him to allow the other party to repudiate the contract and set up the Statute of Frauds in justification thereof, equity will regard the case as being removed from the operation of the statute, and will enforce the contract. Long on Irrigation, Secs. 177, 178, and authorities supra; 27 Corpus Juris, p. 342, Sec. 427; Storey's Equity Jurisprudence, Vol. 2, Sec. 1977;

Morris v. Gaines, 82 Texas, 255, 17 S. W., 538; Ponce v. McWhorter, 50 Texas, 562.

In the case of Morris v. Gaines, just cited, this court said:

"The part performance to take a case out of the operation of the statute must be by the party who seeks to enforce the contract. The taking possession and making valuable improvements by the vendee will as a general rule entitle him to a decree of specific performance (Ann Berta Lodge v. Leverton, 42 Texas, 18); and it was held at a very early day in the English courts that delivery of the possession by the vendor was a sufficient part performance on his part to enable him to recover the purchase money. Pike v. Williams, 2 Vern., 455; Earl of Aylesford's case, 2 Stra., 783. This rule seems to have been very generally recognized since that time. Pome. on Spec. Perf., Sec. 118. Whether it be inconsistent with the principles announced in Lodge v. Leverton, supra, we need not here decide. The doctrine is well established that where either party, in reliance upon the verbal promise of the other, has been induced to do or forbear to do any act, and thereby his position has been so changed for the worse that he would be defrauded by a failure to carry out the contract, equity will enforce a performance."

In the case of Ponce v. McWhorter, 50. Texas, 562, 572, this court, in an opinion by Associate Justice Gould, thus stated the rule:

"The ground upon which such verbal sales are enforced, notwithstanding the statute, is the prevention of fraud (42 Texas, 31, supra.) The rule is thus stated by Justice Clifford in a recent case: 'Where one of the two contracting parties has been induced or allowed to alter his position on the faith of such contract to such an extent that it would be fraud on the part of the other party to set up its invalidity, courts of equity hold that the clear proof of the contract and of the acts of part performance will take the case out of the operation of the statute, if the acts of part performance were already such as to show that they are properly referable to the parol agreement.' (Williams v. Morris, 5 Otto, 457).

"The change of circumstances growing out of valuable improvements has been assumed to be such as to make it difficult or impossible to restore the vendee to his position."

Under the facts of this case, as we have detailed them, it would manifestly be a legal fraud on the rights of Burkett to permit the plaintiff in error here to set up the Statute of Frauds, and therefore the trial court very properly entered judgment in favor of Burkett.

We have heretofore quoted the letter of The Texas Company,

written by H. M. Anderson, its General Superintendent, to Burkett, on August 16, in which the latter was advised: "We will forfeit our water contract with you on the expiration of the date named." The necessary meaning of this language is the recognition of a contract to be forfeited. There can be no forfeiture of a contract that has no existence. Forfeiture presumes a pre-existing valid contract or obligation. Roblee v. Masonic Life Assn., 77 N. Y. Supp., 1098, 1100. The writing of this letter by The Texas Company is entirely unexplained in this record, although Mr. Anderson, who wrote it, was on the witness stand. If Burkett's contract in reality was to expire on the expiration date written in the same, the writing of this letter was plainly uncalled for and unnecessary. The language of the letter, therefore, presupposes the existence, or possible existence, of a contract subsequent to the expiration date. But whether or not this letter was sufficient to take the oral option and extension or renewal of the written contract out of the Statute of Frauds, we find it unnecessary to determine, inasmuch as we have decided the case on other grounds, which appear to us to be sound. The Court of Civil Appeals has, in our opinion, sufficiently disposed of the other questions raised.

The judgments of the trial court and Court of Civil Appeals are therefore affirmed.