### MAHAN v. BRADER.

No. 15283.

Court of Civil Appeals of Texas.
Fort Worth.
Oct. 5, 1951.

Rehearing Denied Nov. 2, 1951.

Marshall & King, and Frank L. Jennings, Jr., all of Graham, for appellant.

Harrell & Harrell, of Breckenridge, for appellee.

HALL, Chief Justice.

R. R. Brader, appellee herein, sued appellant, Lewis Mahan, in a district court of Young County, to enforce the provisions of a certain contract made by and between appellee and Belfort Oil Company, dated in May, 1943, in so far as same applied to a certain oil and gas lease assigned to appellant by said Oil Company on October 20, 1950.

When the 1943 contract was executed between appellee and the Belfort Oil Company, appellee was owner of certain oil and gas leases in Young County, on some of which he had drilled three producing wells. The contract in question provided that Brader convey some of the leases which he owned to Belfort Oil Company, reserving unto himself certain royalty interests and options to be exercised in the future, depending upon the development of said leases by Belfort Oil Company. Most of the provisions of the comprehensive contract are not pertinent to the issues here.

The case was tried to a jury and upon certain findings made by it the court entered judgment for appellee Brader in the sum of $1652, together with interest there-

on at the rate of six per cent per annum until paid (which was one-half of the salvage sold from the lease by appellant less one-half of the salvage left unsold), and recovery of the oil and gas lease in question, known as the Sallie Ann Newhaus Clark lease and being the east 120 acres of the north 160 acres of the 410 acre tract out of the E. L. & R. R. Co. Survey No. 1, patented to A. B. Gantt in Young County.

Appellee does not contend that appellant owes him for one-eighth of the override which he acquired in the lease under numbered paragraph VI of the contract. This amount has been paid during the production. His contention is and he sued the defendant for one-half of the proceeds which appellant received when he junked the well and sold the salvage, plus title to the lease on the 120 acres in question, according to the provisions of paragraph IX of said contract.

The lease in question was purchased by the Belfort Oil Company under authority set out in the provisions of numbered paragraph XII of the contract, to-wit: "It is contemplated by the parties that additional acreage may be acquired adjacent to the acreage above described, from or with the assistance of the said Brader, in which event such acreage shall be held by Belfort subject to the same option on the part of Brader as provided for the acreage covered by Paragraph VI hereof, and subject to the further right of Belfort to reimburse itself for acquisition costs or to receive from Brader ½ of such acquisition costs."

Paragraph VI which is referred to in numbered paragraph XII, controlling the encumbrances placed upon the lease in question, is thus: "Brader further agrees for the same consideration of $500 paid for the said 180 acres, to assign to Belfort the remaining leasehold estate described in Exhibit A, (less the 140 acres and 180 acres described in Paragraph II) reserving to himself an overriding royalty of ⅛ of ⅞ of the oil produced, sold and saved therefrom. He will also furnish abstracts of title showing good and merchantable title in him to said leases, hereby representing

that all of such leasehold estates are in the usual and customary form and for the periods shown in said exhibit."

Appellant contends in point one that a portion of paragraph IX (c) of the contract involved is unenforceable because it contravenes the provisions of the statute of frauds, to-wit, Article 3995, R.C.S. That portion of paragraph IX (c) is: "In the event under the provisions hereof any well is to be reassigned, there shall also be reassigned with said well *a reasonable amount of acreage covered by the leasehold thereon.*"

We believe that subdivision (c) of paragraph IX should be interpreted along with other portions of said paragraph, which are as follows:

"Belfort further agrees to reassign to the said Brader the leasehold interest as to any of such leases or any part thereof:

"(a) In the event it shall determine not to pay the delay rentals thereon. In such event it is to give the said Brader notice of its determination at least sixty days prior to the due date of such delay rentals, and tender him a reassignment thereof.

"(b) In the event in its judgment at any time prior to the expiration of the leases, it shall determine that the development of any part of the property covered by said leases would be economically unjustifiable. In such event it shall so notify the said Brader and reassign that part of said leasehold to him at least one year prior to the expiration thereof."

 It is noted in the provisions of subdivisions (a) and (b), supra, Belfort was to reassign to appellee the entire leasehold interest in the event Belfort failed to pay the rentals or failed to develop said leases or any part thereof. We, therefore, interpret the provisions under subdivision (c) that Belfort would reassign the entire lease after Belfort had deemed the operation of all of the wells on a certain lease unprofitable, if there be more than one. If there be only one well and Belfort shall deem the operation of it unprofitable, then in that event it would, upon receipt of one-half of the reasonable value of the salvage from appellee, assign the entire tract described in the lease to appellee. On the other hand, if there is more than one well producing on a lease and Belfort deemed the operation of one or more of the wells unprofitable but not all of them, then in that event Belfort would only reassign to appellee, after receiving one-half of the reasonable value of the salvage, a reasonable amount of acreage, surrounding each abandoned well, covered by the leasehold thereon.

As set out in subdivision (c) of paragraph IX, the term "or thereafter," which is preceded by "either during the term of the lease," is surplusage so far as this lease is concerned, because in the original lease is the following provision: "It is agreed that this lease shall remain in force for a term of ten years from this date, said term being hereinafter called 'Primary Term,' and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

 Since appellee and Belfort have dealt and operated under provisions of this contract from 1943, when the lease in question was assigned to Belfort at the instance of appellee, and since appellant acted under its provisions after he acquired title to the lease, we believe that appellant is now estopped to raise the question that provisions under paragraph IX (c) contravene the statute of frauds. Texas Co. v. Burkett, 117 Tex. 16, 296. S.W. 273, 54 A.L.R. 1397.

In passing upon this question of estoppel, we note a letter from appellant's attorneys to appellee, the following portion of which was introduced in evidence:

"Re: Sally Ann Clark, Well No. 1, Belfort
February 13, 1951

"Dear Sir:

"As you will recall heretofore, to-wit: on or about the 18th day of May, 1943, you made, executed and delivered a certain contract with Belfort Oil Company concerning oil and gas lease known as the Sally Ann Clark on which there is now located a well and under paragraph 9 there were certain provisions with reference to your having the oil and gas leasehold interest reassigned to you in case of abandonment of the well.

Mr. Lewis Mahan would like to abandon this well and have a stipulation agreement with reference thereto.

"The first proposition would be to have the Britton Casing Company, where a Mr. Bowden is operator, have a test made on the casing as to the amount of casing that could be and would be recovered * * *."

■ Appellant's admission that the title to his lease is subject to the provisions of the contract in question here establishes the fact that he is not an innocent purchaser. Appellee held in his possession a written instrument outlining to him his interest in the lease under the provisions of the written contract, along with a legal description of the land covered by the lease. This admission on the part of appellant also places his action and conduct toward the purchase of this property in privy with appellee's interest and operational activities with Belfort, which were not inconsistent with provisions of the contract. In other words, when appellant purchased the lease in question, if he doubted the lease not being covered by the general provisions of the contract, he could have, by proper inquiry, found out from appellee that he had such instrument from Belfort, giving a proper legal description and outlining appellee's interest in said lease. See 43 Tex.Jur., p. 621.

We overrule appellant's point one.

Appellant's point two is as follows: "The trial court erred in overruling appellant's contention that the contract involved in this case is unenforceable because it is in violation of the Rule against Perpetuities."

Appellant contends the following words prevent said contract from being unenforceable because it is in violation of the rule against perpetuities: "Belfort further agrees to reassign to the said Brader the leasehold interest as to any of such leases or any part thereof: * * * (c) In the event production shall be procured, but Belfort shall deem the operation of any well unprofitable, *either during the term of the lease or thereafter*. Provided, however, that it shall be under no obligation in such event to reassign its interest in said well except upon the payment to it of ½ of the

reasonable value of the salvage obtainable by abandonment of said well."

■ Still hazarding the possibility of the question before us being moot, since the lease may or may not be in force, we will continue such discussion. We find the provision complained of is no more than a reversionary clause as is usually found in contracts pertaining to oil and gas leases between landowners and oil men, as well as between assignees and assignors of oil and gas leases. Weber v. Texas Company, 5 Cir., 83 F.2d 807.

The content of the provision complained of does not prevent the lease from being transferable. It did not prevent said lease from being transferred by Belfort to appellant. We do not find that it perpetuated title to the property beyond the rule against perpetuities. If, as and when the lease may be reassigned to appellee, it would vest a fee simple in him, his heirs or legal representatives, so long as same was enforceable.

■ Appellant's point three is as follows: "The trial court erred in overruling appellants' contention that the portion of the contract relied upon by appellee in this case is not applicable to the leasehold estate involved in this case."

The trial court tried this case upon the theory that provisions of numbered paragraph IX applied to the lease in question. Portions of said paragraph IX pertinent to this issue are as follows:

"Belfort agrees that within six months from the date hereof it will cause abstracts of title described in Paragraph VI hereof to be examined for the purpose of determining whether or not such titles are substantially defective, * * *."

"Belfort further agrees to reassign to the said Brader the leasehold interest as to any of such leases or any part thereof: * * *.

"(c) In the event production shall be procured, but Belfort shall deem the operation of any well unprofitable, either during the term of the lease or thereafter. Provided, however, that it shall be under no obligation in such event to reassign its interest in said well except upon the pay-

ment to it of ½ of the reasonable value of the salvage obtainable by abandonment of said well.

"In the event under the provisions hereof any well is to be reassigned, there shall also be reassigned with said well a reasonable amount of acreage covered by the leasehold thereon."

We find the following phrase set out in paragraph XII, " * * * in which event such acreage shall be held by Belfort subject to the same option on the part of Brader as provided for the *acreage* covered by paragraph VI hereof," is sufficient to bring its subject matter under the terms of the contract as set out in paragraph IX(c), upon which this law suit is based, because its provisions also cover the acreage as is set out in paragraph VI.

■ Appellant's point four is: "The trial court erred in its judgment in awarding the appellee title and possession of the entire 120 acres covered by the lease involved in this case rather than a reasonable amount of acreage around the well located on the lease."

We believe we have answered this point while discussing appellant's point one, because the facts show that the well from which appellee pulled the tubing and sold the equipment, all except the casing therein, was the only well on the lease in question. The primary purpose of subdivision (c) of paragraph IX evidently was to allow appellee, by purchase of one-half of the equipment in the well, to undertake to produce the same and not only produce the particular well in question but to develop the lease which would otherwise be forfeited if there was no additional production on same at the time appellant abandoned the well. Since there is only this particular well on the lease and appellant desires to abandon the same, the lease would naturally terminate under its own terms in so far as appellant is concerned.

We would have a more serious question before us if there were producing wells on this lease other than the one which appel-

lant undertook to abandon, because in that event the trier of the facts would have to determine what would be a reasonable amount of acreage to go with the well being abandoned.

We believe that if it were necessary for the general terms in paragraph IX(c) complained of by appellant to be construed alone that his contention would merit consideration in so far as said terms would contravene the statute of frauds.

■ Appellant's point five is as follows: "The trial court erred in admitting in evidence a photostatic copy of the contract involved in this case over appellant's objection that the originals of the contract were not properly accounted for, nor the photostatic copy properly authenticated."

This objection would be more serious if the record did not show that appellant was familiar with the contents of the contract. This is borne out by the contents of the letter sent to appellee by appellant's attorneys.

The assignment which appellant received from Belfort contains the following paragraph: "It is understood by all parties that this assignment is subject to all oil payments and overrides now outstanding against said properties, and to all conditions as outlined in agreement made between Belfort Oil Company and R. R. Brader of Ft. Worth, Texas."

The evidence further shows that appellee Brader lost his signed copy of the contract. It had not been placed of record. Belfort Oil Company would not allow the original to be taken from their office in Dallas, Texas, but it allowed photostatic copies made thereof, which were introduced in evidence. Appellee Brader verified his own signature, as well as those of other signers of the instrument.

We believe under all the attendant circumstances that the trial court did not err in allowing the secondary evidence introduced.

Having overruled appellant's points, the judgment of the trial court is affirmed.