**NATIONAL RESORT COMMUNITIES, INC., et al., Appellants,**

v.

**Kenneth L. CAIN et al., Appellees.**

No. 11890.

Court of Civil Appeals of Texas, Austin.

April 12, 1972.

Stayton, Maloney, Black, Hearne & Babb, Douglass D. Hearne, Austin, for appellees.

O'QUINN, Justice.

Decision in this case turns on whether the doctrine of promissory estoppel will defeat appellants' plea that oral promises given at the making of certain written contracts to purchase lots in a lakeside subdivision are not now enforceable because descriptions of the lots were insufficient in the writings to meet requirements of the Statute of Frauds.

The subdivisions are part of a resort project developed on Lake Travis, in Travis County, following creation of the lake by construction of a dam across the Colorado River for operation by the Lower Colorado River Authority.

Kenneth L. Cain and wife, together with three other married couples and one single person,[1] brought this lawsuit to enforce promises made by an agent of appellants [2] that plaintiffs, as purchasers of lots designated in the contracts, would be buying lots having water frontage in a proposed new section of a subdivision.

Appellants have not denied the representations made by their agent in connection with the several contracts made between March 18 and June 25 in 1969. After the making of the contracts, when appellants platted the new subdivision, frontage on the lake waters was not assured because lot boundaries extended westerly toward the lake only to a contour line 715 feet above sea level, which was the highest elevation of the overflow easement held by the Lower Colorado River Authority. The lots did not reach the water's edge, and did not, as was prom-

————◆————

Leonard L. Franklin, Austin, for appellants.

1. Plaintiffs below, all of whom are appellees here, were Kenneth L. Cain, Betty R. Cain, Donald M. Yarbrough, Joan B. Yarbrough, Irene B. Yarbrough, Richard W. Young, Genevieve Young, Paul P. Nelson, Jr., and Adell Nelson.

2. Defendants below were Lago Vista, Inc., a Texas Corporation, T. M. Irvin, James W. Small, General Electric Credit Corporation, and Central Investment Company; all are appellants here, except Lago Vista, Inc., which is succeeded by National Resort Communities, Inc.

ised, extend to the center of the channel of the Colorado River as the river existed prior to construction of the dam impounding the lake waters.

Appellants' position is that "Appellees having chosen to press for rights which were not within the contemplation of the developers of the subdivision . . . [appellants have] no choice but to stand on the unenforceability of such claims by virtue of the Statute of Frauds."

The parties entered into stipulations as to many relevant facts, among them being that early in May of 1969 Lago Vista, Inc., acquired "title to the lands encompassing the lots which are the subject of this controversy" and that title included the lands below the 715-foot contour "to the center of the old Colorado River bed, subject to innundation [sic] rights of the Lower Colorado River Authority . . . ."

In addition to the extended stipulations, oral testimony was heard and considered by the trial court, after all parties withdrew requests for trial by jury.

The trial court entered judgment in favor of plaintiffs and ordered specific performance by appellants in keeping with the promises that the purchasers should have deeds of lots extending into the lake and to the center of the original channel of the Colorado River. We will reverse the judgment of the trial court and remand the cause to the trial court.

Each of the five contracts involved in this case followed a general pattern common to all.

Cain and his wife entered into a written contract in March to purchase Lot No. 408 for $5,500, paid $550 down, and agreed to monthly installments of $75 commencing with June of 1969. On the same date a written "Sales Deposit Receipt" was executed by the parties, setting out the lot number, the total consideration, amount of down payment, and terms of later installment payments. In addition, under "Other terms and conditions," the receipt recited,

"Buyer herein may transfer equity to stake[d] parcel in new area for 6500 total purchase price Lake Front At Lease [sic] 100 x 125 As witness by TM Irvin"

The Donald M. Yarbrough contract was executed in the latter part of March, by which the purchasers agreed to buy Lot No. 607 for $5,500, with $550 down, and the balance at $74 monthly commencing in June. On the same date a written "Sales Deposit Receipt" was executed reciting the consideration and payment terms, and stating as "Other terms and conditions" that, "Customer has Option to Exchange this lot on lot where StaK on New Section of Country Club Water Front price at $6500— 100 x 125 at least"

In a similar procedure Irene B. Yarbrough contracted early in April to buy Lot No. 426 for $5,500, with down payment of $550 and monthly installments of $74 commencing in June. Written into this contract was the statement, "Customer Has option to Exchange for Water Front lot in New Section· CC." In addition, in the "Sales Deposit Receipt," the parties agreed, "Customer has option to Exchange this lot for Water Front lot in New Section Country Club at $6500— 100 x 125 above the Water line 715—"

The Youngs made two contracts in June to purchase Lots 755 and 757 for a consideration of $6,500 for each lot, with down payments of $650 and monthly installments of $87 commencing in September. The "Sales Deposit Receipt" on Lot No. 755 stated, "Customer has Option on 772 773 At Same Price [$6500]", and the receipt on Lot No. 757 stated, "Customer has option on 772 and 773 At Same Price."

The Nelson contract was executed in June for purchase of Lot No. 775 at $6,-500, with down payment of $650, and monthly installments of $87 commencing in August. This lot was identified on a preliminary plat as being in the new section, and Nelson and his wife visited Lot No. 775 as staked on the ground. The "Receipt" stated, "Customer has option on

two lots Staked on Hill not a Water front or Golf Fair Way at $5500 Each."

All contracts and each "Sales Deposit Receipt" executed contemporaneously were made a part of the stipulations of the parties. By the stipulations it was agreed that the Cains, the Yarbroughs, and Irene Yarbrough, before making their contracts, visited and selected a platted lot named in the contract, which were hillside sites, and also selected a site in the unplatted area which was identified by a single stake with the name of the purchaser on the stake.

The parties further stipulated that T. M. Irvin represented to these purchasers in each instance "that if they executed a contract for a lot in the platted portion . . they would be given the right to apply whatever equity accrued under the contract towards the purchase of a lot of their choice in the as yet unpurchased and unplatted portion of Lago Vista, when the same was purchased and platted." The parties also stipulated in each instance that the lot of the purchasers' choice was identified as a certain numbered lot in the new section, and that "Irvin represented that the lot when platted would extend either to the water's edge or to the center of the old Colorado River bed and it was understood that the lot when platted which encompassed the stake would be the lot to which the . . . [purchasers] could apply their equity."

By the time the Youngs and the Nelsons visited Lago Vista and entered into contracts in June of 1969 a preliminary plat had been prepared, the new section having been acquired by Lago Vista in May.

With respect to the Young contracts, the parties stipulated that " . . . Irvin represented to . . . [the Youngs] that if they executed contracts to purchase Lot Nos. 755 and 757 they would be given the right to purchase Lot Nos. 771 and 772 or 772 and 773 and further represented, in the alternative, they would have the right to cancel the contracts to Lot Nos. 755 and 757 and apply whatever equity had accrued under such contracts towards the purchase of Lot Nos. 771 and 772 or 772 and 773."

Further stipulations were that the " . . Youngs and Irvin visited and selected all of said lots. At the time of such visits the western boundaries of said lots were staked along the 715 foot elevation contour line and a preliminary plat displayed by Irvin to the Youngs showed the western boundaries of Lot Nos. 771, 772 and 773 to approximate the 715 foot elevation contour line. Irvin represented that the western boundaries of Lot Nos. 771, 772 and 773 would be extended either to the water's edge or the center of the old Colorado River bed."

Stipulations as to the Nelson contract were that after visiting Lot No. 775 in the new section and having seen the lot on a preliminary plat showing its western boundary at the 715-foot elevation, the Nelsons entered into the contract and made a down payment " . . . in reliance on Irvin's representation that the western boundary of said lot would extend either to the water's edge or the center of the old Colorado River bed."

In the latter part of July, 1969, after Lago Vista "learned of the Plaintiffs expectation of the extention [sic] of the western boundaries of the lots they had selected to the water's edge or the center of the old Colorado River bed," the company advised the purchasers that such extension could not be made. Lago Vista offered to permit the purchasers to apply their equities to the lots as platted or to refund all money paid.

Appellants urge, under four points of error, that (1) the unwritten promises and agreements for the sale of real estate may not be enforced because in contravention of the Statute of Frauds; that (2) specific performance should not have been granted because under the statute the agreements were too uncertain and indefinite; that (3) specific performence of the agreements, if enforceable, contained conditions

precedent not performed; and that (4) the trial court granted possession of the lots without demand and without right under the agreements.

Appellants rely on the rule of Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114 (1921), a doctrine firmly established in Texas long prior to that decision. Because under the stipulations it is undisputed that at the time this controversy arose appellees had paid only a part of the consideration, had not taken possession of the lots, and had not made any permanent improvements, appellants insist that the facts of the case do not come within the exception to the Statute of Frauds recognized under the doctrine of Hooks v. Bridgewater.

Appellants further insist that before equity will intervene and set aside the statute something more than a mere wrong or breach of contract must be shown. See Meyer v. Texas National Bank of Commerce of Houston, 424 S.W.2d 417, 419 (Tex.Sup.1968). "An examination of the cases," appellants say, "even those cited by Appellees, indicates the transaction becomes a 'fraud' on the purchaser when the purchaser in reliance on the oral representations or agreement, and as a direct consquence thereof, changes his position and is substantially injured thereby."

The parties stipulated that when Lago Vista learned, late in July of 1969, that the purchasers expected the western boundaries *"of the lots they had selected"* to be extended "to the water's edge or the center of the old Colorado River bed," Lago Vista advised the purchasers in writing "that this could not be done and offered Plaintiffs the choice of applying their equities *to the lots as platted* [westerly only to the 715-foot contour] or a refund of all monies theretofore paid." (Emphasis added)

On appeal appellants state that " . . . if Appellees entered into these contracts in reliance on oral representations that Appellants are not prepared to carry out, then

Appellants will *not enforce such contracts* and will return all monies paid thereunder." (Emphasis added)

It is not argued by appellants that the written contracts entered into were insufficient as binding agreements as to lots in the new section as platted and extending westerly, toward the lake, but not closer to the water's edge than the 715-foot contour line. The controversy grows out of the refusal by appellants to honor the representations of their agent that the purchasers by entering into the written contracts would have the right to receive deeds, when the lots were paid for, conveying to the purchasers water front lots, extending westerly beyond the 715-foot contour into the lake and to the middle of the old Colorado River.

The parties stipulated: "If a judgment is entered . . . directing . . . [appellants] to deliver a deed or deeds to any of the plaintiffs such deed will run to the center of the Colorado River by a natural and continuous extension of the northern and southern boundary lines of the lot covered by such deed, where possible and within discretion of court, subject to all prior recorded easements and rights."

The purchasers made substantial down payments, ranging from $550 to $1,300, and continued thereafter to perform under the contracts by making installment payments specified in the agreements. The contracts provided that "when the full purchase price has been paid, together with . . . charges and . . . fees," the seller would deliver to purchasers general warranty deeds and title policies, with taxes to be prorated as of the purchase date.

■ Appellees, in seeking to enforce the written contracts, invoke the doctrine of promissory estoppel to prevent appellants from interposing defenses under the Statute of Frauds as to representations by their agent that the lots selected would extend westerly to the water's edge or to the cen-

ter of the river. In general, to avoid the bar of the Statute of Frauds, it is the rule that a plaintiff must aver and prove facts setting out the equitable circumstances relied upon. Paschall v. Anderson, 127 Tex. 251, 91 S.W.2d 1050, 1051 (1936); Pappas v. Gounaris, 158 Tex. 355, 311 S.W.2d 644, 647 (1958).

Appellees argue that it was because of " . . . concern over the various means by which . . . [the Statute of Frauds] can . . . be used as a vehicle for fraud . . . that the Courts of this State long ago grafted exceptions onto the Statute of Frauds. In the case at bar, one of these exceptions, the doctrine of Promissory Estoppel, applies and precludes Appellants from invoking the Statute of Frauds."

In support of this contention appellees rely on Wheeler v. White, 398 S.W.2d 93 (Tex.Sup.1965); Texas Company v. Burkett, 117 Tex. 16, 296 S.W. 273 (1927); Aubrey v. Workman, 384 S.W.2d 389 (Tex. Civ.App. Fort Worth 1964, writ ref. n. r. e.); Wynnewood State Bank v. Brigham, 434 S.W.2d 874 (Tex.Civ.App. Texarkana 1968, writ ref. n. r. e.); Allen v. Pool, 95 S.W.2d 723 (Tex.Civ.App. Texarkana 1936, no writ); Cooper Petroleum Co. v. LaGloria Oil and Gas Company, 436 S.W. 2d 889 (Tex.Sup.1969).

The Supreme Court, in Wheeler v. White, stated, "The function of the doctrine of promissory estoppel is . . . defensive in that it estops a promisor from denying the enforceability of the promise." The Court quoted from Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618. The boad language of that case is set out: "The vital principle is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice."

As found in the decisions of the Texas Supreme Court, the doctrine of promissory estoppel is that if the promises are such that the promisor can reasonably expect to induce action of a definite and substantial character on the part of the other party and does induce such action, the promises are binding if injustice can be avoided only by enforcement of the promises.

Appellees' position is that, even if it be assumed that the Statute of Frauds is applicable " . . . to the contracts executed by Appellees, it nevertheless appears that Appellant was estopped from asserting this defense because Appellants, through their agent, made certain misrepresentations to Appellees, who, in turn, relied upon them to their detriment and partly performed under them. In such circumstances, Appellees' reliance and part performance have removed their respective contracts from the purview of the Statute of Frauds and Appellants are estopped to assert this defense."

The soundness of the asserted principle of law, as applied to the facts of the cases appellees have cited, is not questioned. None of the cases relied on by appellees, however, involved the performance of a parol agreement for the sale of land, which by well settled rules of law may be enforced only if within the doctrine of Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114 (1921).

In Hooks v. Bridgewater the Supreme Court stated the rule " . . . that to relieve a parol sale of land from the operation of the statute of frauds, three things were necessary . . . " these being payment of the consideration, possession by the vendee, and the making of permanent improvements by the vendee with consent of the vendor. (229 S.W. 1116, col. 1)

As already observed, no contention is made in this case that appellees had completed paying the consideration, or that they had been in possession of the land between the platted lots and the old river,

or that improvements of any kind had been placed on the land.

The doctrine of Hooks v. Bridgewater did not originate with that decision in 1921. The courts of this state had been called upon seventy years earlier to consider whether exceptions to the Statute of Frauds should be made to enforce "the performance of parol agreements for the sale of lands." The equitable basis for an exception was part performance by the vendee. In Garner v. Stubblefield, 5 Tex. 552, 559 (1851), the Supreme Court stated, ". . . it is not to be considered part performance which does not put the party in a situation that is a fraud upon him unless the agreement is performed." The tripartite foundation for the doctrine found expression in the succinct language of Judge Gould in Ponce v. McWhorter, 50 Tex. 562, 571 (1879): "The cases in this court are numerous in which verbal sales of land have been recognized as valid, and enforced, where the purchase-money has been paid, possession taken with the consent of the vendor, and improvements made without his objection." Cited in that decision are a dozen earlier cases, beginning with Garner v. Stubblefield.

By whatever name the equitable plea of the vendee may be called, whether promissory estoppel, equitable estoppel, or estoppel *in pais*, it is a plea raised to estop the vendor from interposing the Statute of Frauds in an effort to avoid passage of the fee. The established doctrine is that ". . . there must be part performance as an earnest of certainty of proof . . ." and the courts "have wisely required that in addition the situation of the vendee must have been so changed thereby that nothing short of specific performance will make him whole." Lechenger v. Merchants' National Bank, 96 S.W. 638, 640 (Tex.Civ. App. Galveston 1906, writ ref.). In practical application the Texas Courts, seeming to have adopted the English doctrine, " . . . proceed upon the broad ground of equitable estoppel." (96 S.W. 640)

Thus it appears that the principle conveniently termed the doctrine of Hooks v. Bridgewater is in itself an application of equity to parol agreements for the sale of lands where payment, possession, and improvements are shown in such manner as to be clearly referable to the contract. By proof of these elements of part performance, in reliance on the contract, proof of a written contract becomes unnecessary and equity will intervene. Where proof of a contract beyond contradiction is lacking, the Supreme Court has said, ". . . a case is not to be determined, even by a jury, by the weight of oath against oath . . ." Edwards v. Norton, 48 Tex. 291, 298 (1877).

No statement of facts has been brought forward, but the parties on appeal appear in agreement that the trial court received and considered evidence in addition to the written stipulations. The judgment recites that the court heard and considered pleadings, stipulations of fact, argument of counsel, and "the evidence adduced during the trial hereof." The judgment states that the trial court was of the opinion that "Plaintiffs should have, and are entitled to, judgment as against the Defendant . . . for specific performance of those certain Contracts of Sale of land *as described by the undisputed evidence heard upon the trial* of this cause . . ." (Emphasis added)

Appellees insist that the contracts contained sufficient description to permit introduction of parol evidence to identify "more properly . . . the subject matter of the contract." The rule is that the writing must furnish within itself, or by reference to some other existing writing, information by which the land can be identified with reasonable certainty. Morrow v. Shotwell, 477 S.W.2d 538 (Tex.Sup.1972), and cases cited. Even if the descriptions, which in all instances referred to the new subdivision and in most instances to "water front" lots, were sufficient to lead to iden-

tity of the platted lots in the new subdivision, the disputed area, between the 715-foot contour and the old river, lacked reasonably certain identity in the writings.

█ We have no doubt that the parties knew and understood what property was intended by them to be conveyed by deeds pursuant to the contracts. But under the rule of Rowson v. Rowson, 154 Tex. 216, 275 S.W.2d 468 (1955) the knowledge and intent of the parties will not give validity to the contracts which fail to supply the means or data by which the land between the platted lots and the old river channel can be identified with reasonable certainty.

█ The stipulations of fact evidence that the parties intended to describe in the several contracts particular and identified lots in the new subdivision which would be at least 100 by 125 feet above the 715-foot contour line and would extend westerly into the lake and to the channel of the old river. It appears that the parties were mutually mistaken in the belief that the descriptions used were sufficient for that purpose. If such be the facts, the appellees as purchasers would have been entitled to reformation of the contracts if they had sought to reform the agreements in the trial court. Morrow v. Shotwell, *supra*; Gilbert v. Smith, 49 S.W.2d 702, 86 A.L.R. 445 (Tex. Com.App.1932); Miles v. Martin, 159 Tex. 336, 321 S.W.2d 62 (1959).

Since it appears that appellees may have tried their case on a wrong theory, and because we find error in the trial court's judgment, we are authorized to remand in the interest of justice. Rules 434 and 505, Texas Rules of Civil Procedure; London Terrace, Inc. v. McAlister, 142 Tex. 608, 180 S.W.2d 619 (Tex.Com.App.1944, opn. adopted); Dahlberg v. Holden, 150 Tex. 179, 238 S.W.2d 699 (1951); Scott v. Liebman, 404 S.W.2d 288 (Tex.Sup.1966); Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 264 S.W.2d 689 (1953).

We have concluded that this cause should be remanded to the trial court in order that appellees may, if they wish, amend their pleadings and try this case on a different theory.

In view of our remand, and in the event another trial should result in a judgment directing delivery of deeds to appellees, we will discuss briefly these directions as they appear in the judgment now before us. The trial court directed delivery of deeds to lots extending to the center of the channel of the Colorado River. The record does not disclose whether the Legislature of Texas by express authority released the State's title to the river channel to Lago Vista or to a predecessor in title. The parties tried this case on the apparent belief that Lago Vista held title to the land extending west of the lots as platted into the lake and "continuing to the center of the Riverbed of the Colorado River."

Survey lines for privately owned lands may not cross any stream in Texas having an average width of thirty feet "from the mouth up," which "shall be considered navigable" within the meaning of the statute. Acts 1837; Gammel's Laws, vol. 1, p. 1405, Art. 5302, Vernon's Ann.Tex.Civ.St.

█ The Colorado River is recognized as a navigable stream within the statute. City of Austin v. Hall, 93 Tex. 591, 57 S.W. 563, 565 (1900). Courts may take judicial notice of the natural features of the state including the location, courses, and history of the rivers. State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065, 1068 (1932).

█ It is settled that the State is the owner of the soil underlying streams made navigable by statute and that the channels and beds of such streams are held in trust by the State for the use and benefit of all the people. State v. Bradford, *supra*, 121 Tex. 515, 50 S.W.2d 1065. No enactment by the Legislature expressed in general language will grant river beds, and only by specific grant under legislative authority can the State convey title to the bed of a navigable stream. State v. Bradford,

*supra*; Diversion Lake Club v. Heath, 58 S.W.2d 566 (Tex.Civ.App. Austin 1933), affirmed 126 Tex. 129, 86 S.W.2d 441 (1935).

 Unless through express authority of the Legislature Lago Vista acquired title to the center of the channel of the Colorado River, title to the middle of the river bed was not acquired. The record does not affirmatively show express grant from the State, except by inference under stipulations of the parties, and it should not be assumed that title was acquired to the center of a navigable stream. Grants of this nature are limited usually to grants from the State to its political subdivisions.

The judgment of the trial court is reversed, and the cause is remanded to the trial court.

Reversed and remanded.