**CITY OF ALTUS, OKLAHOMA, et al.**

v.

**Waggoner CARR.**

**Civ. A. No. 1580.**

United States District Court
W. D. Texas,
Austin Division.

May 6, 1966.

A. W. Walker, Jr., Ben B. West, Dallas, Tex., James W. Wilson, McGinnis, Lochridge, Kilgore, Hunter & Wilson, Austin, Tex., for plaintiffs.

Hawthorne Phillips, First Asst. Atty. Gen., J. Arthur Sandlin, Roger Tyler, Asst. Attys. Gen., of Texas, Austin, Tex., for defendant.

Before THORNBERRY, Circuit Judge, SPEARS, Chief Judge, District Court, and SUTTLE, District Judge.

SUTTLE, District Judge.

This is a suit for declaratory judgment decreeing that Section 2 of Article 7477b, Vernon's Ann.Tex.Civ.Stats.[1] is unconstitutional and void as being in violation of the Commerce Clause[2] of the United States Constitution, and for permanent injunction restraining the enforcement or execution thereof against these plaintiffs.

Section 2 of Article 7477b, Vernon's Ann.Tex.Civ.Stats. (Supp.1965) reads:

"No one shall withdraw water from any underground source in this State for use in any other state by drilling a well in Texas and transporting the water outside the boundaries of the State unless the same be specifically authorized by an Act of the Texas Legislature and thereafter as approved by it."

After a careful consideration of the record, briefs and arguments of counsel,

1. Sec. 2 of H.B. No. 225, Tex.Acts 1965, 59th Leg., ch. 568 at 1245, effective Aug. 30, 1965.

2. Article 1, Section 8, Clause 3, United States Constitution.

we are of the opinion the plaintiffs are entitled to the relief prayed for.

## Summary of Stipulated Facts

The Plaintiff, City of Altus, Oklahoma, is a municipal corporation and county seat of Jackson County, Oklahoma, and Plaintiffs, C. F. Mock and Pauline Mock, are husband and wife and reside in the City of Altus, Oklahoma. The Defendant Waggoner Carr is the Attorney General of the State of Texas.

The Plaintiff, City of Altus, has an annual water allotment of 4,800 acre feet, set in 1941, from the W. C. Austin Project of the U. S. Bureau of Reclamation. In recent years, due to a rapid growth in population,[3] there has been an increased demand upon the available water supply, which cannot be increased as all available water drawn from the Project over and above the allotment is committed to other users. In 1963, the City of Altus used its entire water allotment, and in 1964 was required to borrow some 700 acre feet of its 1965 allotment.

In December, 1963, foreseeing the problem of water shortage, the City of Altus retained an engineering firm to make recommendations as to potential sources of water that might be economically developed so as to meet its future requirements. In its March, 1964, Report on Water Supply,[4] the engineering firm recommended that the City of Altus acquire from C. F. Mock and his wife, Pauline, the subsurface water rights in and to land owned by them in northern Wilbarger County, Texas, noting in such report that the Attorney General of the State of Texas in December, 1963, rendered an opinion that it would be legal for a Texas property owner to sell water from his land to an Oklahoma user.[5]

The Mocks' land, approximately 5,663 contiguous acres, lying in northern Wilbarger County, Texas, borders the Red River, the boundary line between Wilbarger County, Texas, and Jackson County, Oklahoma, and is some fourteen miles from the City of Altus, Oklahoma. Approximately six square miles of the Mocks' land is located in the extreme northern portion of an area covering approximately 75 square miles known as the Odell Sand Hills, under which there is a natural subsurface water-bearing formation which contains a high quality percolating ground water suitable for municipal use. The City of Vernon, Texas, some 14 miles south of the Mocks' land, has several wells drawing from this formation, the northern-most well being some four miles south of the southern boundary of the Mock property. With the exception of the Odell Sand Hills, there is no economically available ground water within a 50-mile radius of either the City of Altus or the City of Vernon which is of such quality and quantity.

With the permission of the Mocks, and at the request of the City of Altus, a water-well drilling and engineering firm drilled and logged a series of 26 test holes on the Mock land during the month of July, 1964, for the purpose of testing the quantity and quality of the subsurface water and determining the cost of its production. In its report of September, 1964,[6] the drilling and engineering firm recommended that the City of Altus develop two well fields by drilling 13 wells at suggested sites which would have an estimated yearly yield of approximately 2100 acre feet. This combined with the annual allotment from the W. C. Austin Project is estimated to be sufficient to serve the needs of the City of Altus

---

3. The population of the City of Altus has increased from 9,735 in 1959 to an estimated 23,500 at the present. Excluding Altus Air Force Base, which from 1960 through 1963 had a constant resident population of 5,598 persons, the City of Altus has had an average annual increase in population of 589 persons from 1950 to 1960. Report on Water Sup-

ply, March 1964, pgs. 5–8, Plaintiffs' Exhibit No. 2.

4. Report on Water Supply, supra note 3.

5. Attorney General's Opinion C–199, Dec. 20, 1963.

6. Ground Water Survey for City of Altus, Oklahoma, September 1964, Plaintiffs' Exhibit No. 3.

for a period of more than twenty-five years.[7]

In November, 1964, the City of Altus entered into a contract with the Mocks whereby the City of Altus was granted an option for a period of nine months within which to purchase a lease for producing water from subsurface water-bearing formations underlying the Mocks' land. Then, in December, 1964, the citizens of the City of Altus voted to issue $2,000,000.00 in city bonds to pay for the cost of financing the leasing, drilling and transportation of the water produced from the Mocks' land. The bonds were issued in May, 1965, and in the same month the City of Altus and the Mocks executed a lease whereby the Mocks granted, demised, leased and let unto the City of Altus the Mocks' land for the sole and only purpose of mining and operating for subsurface water and for the transportation of such water to the City of Altus for its use. Pursuant to this lease, the City of Altus has to date incurred expenses totaling approximately $110,720.09 in connection with the investigating and leasing of the subsurface water formation underlying the Mocks' land.

On January 26, 1965, however, Article 7477b was introduced in the House of Representatives of the State of Texas as House Bill No. 225 by W. S. Heatly. Representative Heatly represents District No. 82, which includes Wilbarger County, Texas. The Texas Legislature passed Article 7477b on May 28, 1965, and adjourned on May 31, 1965. Unless called into special session, the Texas Legislature will not reconvene until 1967.

### Jurisdiction

The Defendant, Waggoner Carr, asserts that this Court does not have jurisdiction to consider this case for the reasons that: (1) Section 2 of Article 7477b has never been construed by any Texas Court; (2) the Plaintiffs have made no effort to exhaust the state remedy made available to them by the terms of Section 2 of Article 7477b; (3) the suit is prohibited by the 11th Amendment to the United States Constitution as being one by citizens of one state against another sovereign state, and (4) that since the Attorney General of the State of Texas has in no way manifested an intent to enforce Section 2 of Article 7477b, a suit seeking declaratory relief to have this statute rendered unconstitutional is premature and presents no controversy to give this court jurisdiction.

### The Abstention Doctrine

In regard to the first contention, the Defendant submits that it is a well settled principle that federal courts will abstain to exercise jurisdiction in a case where a state statute is under attack as being violative of the United States Constitution until such state statute has first been construed by the courts of that state. This, in general, is true, e. g., Government and Civic Employees Organizing Committee, CIO v. Windsor, 353 U.S. 364, 366, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957); Shipman v. Dupre, 339 U.S. 321, 322, 70 S.Ct. 640, 94 L.Ed. 877 (1950); American Federation of Labor v. Watson, 327 U.S. 582, 595–599, 66 S.Ct. 761, 90 L.Ed. 873 (1946); Spector Motor Service v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944); Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 171–173, 62 S.Ct. 986, 86 L.Ed. 1355 (1942); Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 499–501, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The bases for the doctrine of abstention are "the desirability of avoiding unseemly conflict between two sovereignties, the unnecessary impairment of state functions, and the premature determination of constitutional questions". Martin v. Creasy, 360 U.S. 219, 224, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959); Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, (1941). We observe, however, the doctrine of abstention is not an absolute rule to be applied to

---

7. Report on Water Supply, supra note 3, at 21–22.

all cases involving the constitutionality of a state statute. In the recent case of Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964), the Supreme Court stated:

"The absention doctrine is not an automatic rule to be applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers. Ascertainment of whether there exist the 'special circumstances,' * * * prerequisite to its application must be made on a case-by-case basis." (citations omitted)

In this connection, we note that in the case of Harrison v. N.A.A.C.P., 360 U.S. 167, 176, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), the Supreme Court, in restating the abstention doctrine, said "that the federal courts should not adjudicate the constitutionality of state enactments *fairly open to interpretation* until the state courts have been afforded a reasonable opportunity to pass upon them" (emphasis supplied), and that the case of the United States v. Livingston, 179 F. Supp. 9, 12–13 (E.D.S.C., 1959) affirmed 364 U.S. 281, 855, 80 S.Ct. 1611, 4 L.Ed. 2d 1719 (1960), stated:

"Though never interpreted by a state court, if a state statute is not fairly subject to an interpretation which will avoid or modify the federal constitutional question, it is the duty of a federal court to decide the federal question when presented to it."

Accord: Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177 (1965); Hosteller v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 328, 84 S.Ct. 1293, 12 L.Ed. 2d 350 (1964); City of Chicago v. Atchison T & S. F. Ry. Co., 357 U.S. 77, 84, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); and Toomer v. Witsell, 334 U.S. 385, 392, footnote 15, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

The question here is simply whether Section 2 of Article 7477b is unconstitutional and void as being violative of the Commerce Clause of the United States Constitution. There is no question of state ownership of captured underground water, for the law of Texas is well settled that the landowner has the right to drill wells and appropriate the water beneath his land. City of Corpus Christi v. City of Pleasanton, 154 Tex. 289, 276 S.W.2d 798 (1955); [8] Houston & T. C. Ry. Co. v. East, 98 Tex. 146, 81 S.W. 279, 66 L.R.A. 738 (1904). We are not here concerned with state regulation of a public property, but rather the impediment of an interstate shipment of an article of commerce. Section 2 of Article 7477b is not *"fairly open to interpretation."* We find such Section is clear and unambiguous in meaning, and that under no reasonable construction could the constitutional issue here presented be avoided.

As a basis for the Defendant's second contention asserting the abstention doctrine, the Defendant claims the Plaintiffs are not entitled to an adjudication of the issues in the case at bar until such time as they exhaust the State legislative remedy set forth in Section 2 of Article 7477b. In support thereof, the Defendant cites the case of Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L. Ed. 1002 (1951). In that case the plaintiff, a railroad, after having been denied a permit to discontinue certain intrastate train service by the Alabama Public Service Commission, filed suit in federal court to enjoin enforcement of the Commission's order. The Supreme Court, noting that under Alabama law the railroad had an appeal as a matter of right from the Commission's order to the state courts of Alabama, held that since an adequate state court review of the administrative order was available to the plaintiff the

---

**8.** The case of City of Corpus Christi v. City of Pleasanton, 154 Tex. 289, 276 S.W.2d 798 (1955), stated that the rule in Texas was that an owner of land could use all of the percolating water he could capture from the wells on his land for whatever beneficial purposes he needed it, on or off the land, and could likewise sell it to others for use on or off the land and outside the basin where produced, just as he could sell any other species of property.

federal district court should have abstained from exercising its jurisdiction.

The present case, however, differs from Alabama Public Service Commission v. Southern Railway. Here the remedy involved is an application to the Legislature of the State of Texas for them to pass an act authorizing the Plaintiffs to transport the water from the Mock's land to the City of Altus, Oklahoma. This remedy, if it can truly be called such, is in the nature of a political or special legislative remedy, rather than an administrative or judicial remedy as was involved in the Alabama Public Service Commission case. In view of the facts of this case, including the circumstances leading to the enactment of the statute in question, we doubt Plaintiffs had any realistic remedy available through the Texas Legislature. We are, consequently, of the opinion that the Plaintiffs should not be required by this court, a court of equity, to exhaust such "remedy." We, therefore, exercise our discretion to assume jurisdiction of the case for adjudication on the merits, rather than abstain. Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 736, 84 S.Ct. 1459, 12 L.Ed. 2d 632 (1964).

### The 11th Amendment

The Defendant's third plea to the jurisdiction of this court is that this suit is prohibited by the 11th Amendment to the United States Constitution.

■ The test for determining whether the 11th Amendment applies to a suit is stated in Ex Parte Young, 209 U.S. 123, 155, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). It was there stated that:

"[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."

■ In support of his contention, the Defendant asserts that he, as Attorney General of the State of Texas, is not specifically responsible for the enforcement of Section 2 of Article 7477b, citing the case of Fitts v. McGhee, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899) as controlling. The holding of the Fitts case,[9] however, was limited and modified in Ex Parte Young for the reason that it limited the doctrine of Smyth v. Ames [10], 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), the subject of comment by the court in the Fitts case. In this regard Ex Parte Young stated:

"In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

"It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed ([Reagan v. Farmers' Loan & Trust Co.,] 154 U.S. 362, 366, [14 S.Ct. 1047, 38 L.Ed. 1014] § 19 of the act), but that may possibly make the duty more clear; if it otherwise ex-

---

9. The case of Fitts v. McGhee, 172 U.S. 516, 19 S.Ct. 269 (1899), held that a suit against a state officer, who did not have any special relation to the particular statute alleged to be unconstitutional, nor expressly directed to see to its enforcement, was a suit within the contemplation of the 11th Amendment.

10. The Supreme Court in Smyth v. Ames, 169 U.S. 466, 518, 18 S.Ct. 418 (1898), stated: "It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of a state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff is not a suit against the state within the meaning of that [the 11th] Amendment."

ists it is equally efficacious. *The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of general law, or is specially created by the act itself, is not material so long as it exists.*" 209 U.S. at 157, 28 S.Ct. at 453 (emphasis supplied)

Therefore, we believe the rule set forth in the Young case, rather than the Fitts case, is controlling.

■ The question here, then, is whether or not the duty of the Defendant toward Section 2 of Article 7477b is sufficient to meet the standard set forth in Ex Parte Young. In this connection, it is noted that the Attorney General is, by virtue of his office, generally charged with the enforcement of the laws of the State of Texas, Agey v. American Liberty Pipe Line Co., 141 Tex. 379, 172 S.W.2d 972, 974 (1943). Mention is made by us of Article 7477(11), Vernon's Ann.Tex. Civ.Stats., Title 128, Water, Chapter 1, which states in part:

> "Suits to enforce any provisions of this Chapter may be prosecuted in the courts of the State by the Attorney General".

The Defendant Waggoner Carr is, by virtue of this statute, specifically granted the authority to prosecute suits to enforce the provisions of Chapter 1, of which Section 2 of Article 7477b is a part. Therefore, on the basis of the foregoing, this court finds that the Defendant herein meets the test set forth in Ex Parte Young in that he has "some connection with the enforcement" of Section 2 of Article 7477b, thereby taking the case without the contemplation of the 11th Amendment to the United States Constitution. The fact that Article 7477 (11) allows the Attorney General discretionary authority as to the institution of suit to enforce the provisions of Article 7477b is not deemed material. See: Ex Parte Young, 209 U.S. 123, 158–159, 28 S.Ct. 441 (1908).

The Defendant further urges, in connection with his assertion that the suit is prohibited by the 11th Amendment, that there must be affirmative action pursuant to the authority to enforce the particular statute before a suit brought against a state officer is considered to be a suit without the contemplation of the 11th Amendment. Since the same assertion as to the necessity of affirmative action is made in reference to the Defendant's plea to the jurisdiction on the ground of prematurity, we reserve discussion and ruling on this contention until after the discussion of the plea to the jurisdiction on the ground of prematurity.

*The Prematurity Question*

In his final plea to the jurisdiction, the Defendant asserts that since he has in no way manifested an intent to enforce Section 2 of Article 7477b, a suit to declare such statute unconstitutional is premature and presents no controversy. In support of his plea, the Defendant relies upon Southern Pacific Co. v. Conway, 115 F.2d 746, 749 (9th Cir. 1940), for the proposition that a threat to enforce, or an expression of intent to enforce, an unconstitutional statute by a state officer is a prerequisite to the maintenance of a suit to declare such statute unconstitutional.

In Southern Pacific Co. v. Conway, a suit to declare the Arizona Train Limit law unconstitutional, the court held that there was no case or controversy because the defendant, the Attorney General of Arizona, had made no threats to enforce the statute in question and had alleged that he had formed no opinion or belief and made no contention as to the constitutionality or unconstitutionality of the statute in question. Ex Parte La Prade, 289 U.S. 444, 53 S.Ct. 682, 77 L.Ed. 1311 (1933), cited by the court in the Conway case, was to the same effect. There a petition for mandamus was granted requiring the dismissal for lack of jurisdiction of the principal action as the successor Attorney General, substituted in the suit for his predecessor in office, had done no acts or made no threats to enforce the statute in question; the plaintiff could not rely upon

prior threats and acts made by the former Attorney General.

On the other hand, the Plaintiffs rely principally upon the cases of Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, 592, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); Pierce v. Society of the Sisters, 268 U.S. 510, 536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and Brown v. Anderson, 202 F.Supp. 96, 100 (D.Alaska 1962), all of which, in one way or another, indicate a disregard of the requirement of a threat or intent to enforce a statute.

We take notice, also, of the recent case of Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), which concerned an attack on the constitutionality of a Connecticut penal statute prohibiting the use of contraceptives. Therein the Supreme Court, in holding that there was no controversy, stated:

"It is true that this Court has several times passed upon criminal statutes challenged by persons who claimed that the effects of the statutes were to deter others from maintaining profitable or advantageous relations with the complainants. See e. g., Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. But in these cases the deterrent effect complained of was one which was *grounded in a realistic fear of prosecution.* We cannot agree that if Dr. Buxton's compliance with these statutes is uncoerced by the risk of their enforcement, his patients are entitled to a declaratory judgment concerning the statutes' validity". 367 U.S. at 508, 81 S.Ct. at 1758 (emphasis supplied)

An additional approach is presented in Commonwealth of Pennsylvania v. State of West Virginia, which stated:

"The second question is whether the suits were brought prematurely. They were brought a few days after the West Virginia act went into force. No order under it had been made by the Public Service Commission; nor had it been tested in actual practice. But this does not prove that the suits were premature. *Of course they were not so, if it had otherwise appeared that the act would certainly operate as the complainant states apprehended it would. One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.* 262 U.S. at 592, 43 S.Ct. at 663 (emphasis supplied)"

Although there would appear to be a conflict between the holdings of the Supreme Court in Commonwealth of Pennsylvania v. State of West Virginia and Ex Parte La Prade, we believe the correct criterion to be that there must be a realistic fear of prosecution or a realistic fear or apprehension that the statute in question will be enforced against them, and the Court finds that the Plaintiffs herein meet the test of the latter, at least. In this connection, we note that Professor Moore submits that the Court in the case of Southern Pacific Co. v. Conway, which relied upon Ex Parte La Prade in its decision, is in error for the reason that it is not in accordance with the requisite of justiciability set forth in Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); 6 Moore's Federal Practice § 57.19[2] at 3100 (2d Ed. 1965).

In relation to the 11th Amendment question previously reserved, we believe that it is not necessary that the state officer, upon whom the duty of enforcing the particular statute lies, take some affirmative action to enforce such statute. If the officer can, by declining to act, enforce the statute, there is "threat" enough to take the suit without the provisions of the 11th Amendment. This is readily seen in the case presently before the Court. True, the Defendant has done no affirmative acts to enforce Section 2 of Article 7477b against the Plaintiffs, but then he did not have to do so. The very presence of the statute itself and the possibility of its enforcement would preclude the Plaintiffs from making the further substantial expenditures of tax monies necessary to obtain and transport the water from the Mock's

land to the City of Altus. Already, although no water has yet been transported in interstate commerce in violation of Section 2 of Article 7477b, the Plaintiffs have incurred expenses in the approximate amount of $110,720.09,[11] and would incur further expenses in the approximate amount of $1,311,582.69 [12] to effectuate the project.[13] If, however, the statute in question were to be strictly construed so as to require an affirmative "threat", the purpose of Section 2201 of Title 28, United States Code, would be defeated.[14] We are of the opinion that the present case comes well within the purpose of Section 2201, and find that the presence of Section 2 of Article 7477b, in question, and the omission to act on the part of the Defendant constitute sufficient "threat" to take the case without the contemplation of the 11th Amendment.

### Commerce Clause

By virtue of the Commerce Clause, the Congress of these United States was specifically granted the power to regulate commerce among the several states, and the states may not unreasonably burden or interfere with interstate commerce. This is not to say that a state may not, in the absence of conflicting legislation by Congress, make laws governing matters of local concern which may in some measure affect interstate commerce, or even, to some extent, regulate it. Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). Rather, it means that a state may not enact a law which imposes a direct burden on interstate commerce or discriminates against interstate commerce. H. P. Hood & Sons v. DuMond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); The Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913). In the recent case of Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 444, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), an undue or unreasonable burden was defined as one which materially affects interstate commerce where uniformity of regulation is necessary.

The Plaintiffs contend that Section 2 of Article 7477b constitutes an unreasonable burden upon interstate commerce for the reason that it permits the withdrawal and use of underground water subject to the one and only condition that such water shall not be transported to another state. In support thereof, the Plaintiffs rely upon the cases of Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, 43 S.Ct. 658 (1923). and West v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1910).

In the case of Commonwealth of Pennsylvania v. State of West Virginia the Supreme Court had before it the question whether a State wherein natural gas is produced and is a recognized subject of commercial dealings may enact a statute which requires that the consumers of such State shall be accorded a preferred right of purchase over consumers in other States. In holding the statute in question an interference with interstate commerce, the Supreme Court stated:

"The question is an important one; for what one state may do others may, and there are 10 states from which nat-

11. Stipulation of Facts, section 6, at 5.

12. Id. at 5–6.

13. Report on Water Supply, March 1964, Plaintiffs' Exhibit No. 2, Table 7, shows that the total estimated cost, including interest on the debt, to be $3,524,000 over a twenty-five year amortization period.

14. The purpose of the Declaratory Judgment Act, Title 28, U.S.C., § 2201, was succinctly stated in E. Edelmann & Co. v. Triple-A Specialty Co., 88 F.2d 852, 854 (7th Cir. 1937): "It was the congressional intent to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued." Accord: Luckenbach S. S. Co. v. United States, 312 F.2d 545 (2d Cir. 1963); Muskegon Piston Ring Co. v. Olsen, 307 F.2d 85 (6th Cir. 1962), cert. denied 371 U.S. 952, 83 S.Ct. 508, 9 L. Ed.2d 500; Shell Oil Co. v. Frusetta, 290 F.2d 689 (9th Cir. 1961).

ural gas is exported for consumption in other states. Besides, what may be done with one natural product may be done with others, and there are several states in which the earth yields products of great value which are carried into other states and there used. But, notwithstanding the importance of the question, its solution is not difficult. The controlling principles have been settled by many adjudications— some so closely in point that the discussion here may be relatively brief.

"By the Constitution (article I, § 8, cl. 3) the power to regulate interstate commerce is expressly committed to Congress and therefore impliedly forbidden to the states. The purpose in this is to protect commercial intercourse from invidious restraints, to prevent interference through conflicting or hostile state laws and to insure uniformity in regulation. It means that in the matter of interstate commerce we are a single nation—one and the same people. All the states have assented to it, all are alike bound by it, and all are equally protected by it. Even their power to lay and collect taxes, comprehensive and necessary as that power is, cannot be exerted in a way which involves a discrimination against such commerce. (citations omitted)

"Natural gas is a lawful article of commerce, and its transmission from one state to another for sale and consumption in the latter is interstate commerce. A state law, whether of the state where the gas is produced or that where it is sold, which by its necessary operation prevents, obstructs or burdens such transmission is a regulation of interstate commerce—a prohibited interference." 262 U.S. at 596, 43 S.Ct. at 665 (citations omitted)

In West v. Kansas Natural Gas Co., the Supreme Court had before it an Oklahoma statute which denied the right of eminent domain and the right to use the highways of the state for the purpose of transporting natural gas without the state. The effect of the statute was to deny owners of the natural gas the right to transport it out of the state. The Supreme Court, in holding the statute invalid under the Commerce Clause, stated:

"We place our decision on the character and purpose of the Oklahoma statute. * * * It denies to appellees the lesser right to pass under * * * or over [the highways] * *. This discrimination is beyond the power of the state to make. As said by the circuit court of appeals in the eighth circuit, no state can by action or inaction prevent, unreasonably burden, discriminate against or directly regulate, interstate commerce or the right to carry it on. And in all of these inhibited particulars the statute of Oklahoma offends." 221 U.S. at 262, 31 S.Ct. at 574.

The Defendant, however, contends that Section 2 of Article 7477b is not a burden on or interference with interstate commerce for two reasons. First, as evidenced by Section 1 of Article 7477b, the purpose and intent of Section 2 is to conserve and protect the water resources of the State by regulating the withdrawal of water from underground sources, and, second, since the statute here in question operates on and regulates underground water, which is not the subject of absolute ownership, it does not affect a substance which is a subject of commerce. In support of his second contention, the Defendant asserts the cases of Commonwealth of Pennsylvania v. State of West Virginia and West v. Kansas Natural Gas Co., relied upon by the Plaintiffs, are distinguishable from this case, and that the cases of Williams v. City of Wichita, 190 Kan. 317, 374 P.2d 578 (1962) appeal dism. 375 U.S. 7, 84 S.Ct. 46, 11 L.Ed.2d 38, reh. den. 375 U.S. 936, 84 S.Ct. 328, 11 L.Ed.2d 267, and Knight v. Grimes, 80 S.D. 517, 127 N.W.2d 708 (1964), are controlling.

In regard to the Defendant's first contention, we observe the assertion therein is not a novel one. This contention was considered in both Commonwealth of Pennsylvania v. State of West Virginia and West v. Kansas Natural Gas Co. In

the West case, the State of Oklahoma asserted that it had the right to conserve, or rather the right to reserve, the resources of the state for the use of its inhabitants. In answer thereto, the Supreme Court stated:

> "The results of the contention repel its acceptance. Gas, when reduced to possession, is a commodity; it belongs to the owner of the land; and, when reduced to possession, is his individual property, subject to sale by him, and may be a subject of intrastate commerce and interstate commerce. The statute of Oklahoma recognizes it to be a subject of intrastate commerce, but seeks to prohibit it from being the subject of interstate commerce, and this is the purpose of its conservation. In other words, the purpose of its conservation is in a sense commercial—the business welfare of the state, as coal might be, or timber. Both of these products might be limited in amount, and the same consideration of the public welfare which would confine gas to the use of the inhabitants of a state would confine them to the inhabitants of the state. If the states have such power, a singular situation might result. Pennsylvania might keep its coal, the Northwest its timber, the mining states their minerals. And why may not the products of the field be brought within the principle?" 221 U.S. at 255, 31 S.Ct. at 571.

In Commonwealth of Pennsylvania v. State of West Virginia, the Supreme Court again expressed disapproval of this contention, stating:

> "Another consideration advanced to the same end is that natural gas is a natural product of the state and has become a necessity therein, that the supply is waning and no longer sufficient to satisfy local needs and be used abroad, and that the act is therefore a legitimate measure of conservation in the interest of the people of the state. If the situation be as stated, it affords no ground for the assumption by the state of the power to regulate interstate commerce, which is what the act

attempts to do. That power is lodged elsewhere." 262 U.S. at 598, 43 S.Ct. at 665.

Also, the fact that Section 1 of Article 7477b declares that the purpose and intent of such Article is "to conserve and protect all water resources both public and private" does not bind the Plaintiffs, and they may show that the statute in its practical operation is an unreasonable burden on interstate commerce. Foster Fountain Packing Co. v. Haydel, 278 U.S. 1, 10, 49 S.Ct. 1, 73 L.Ed. 147 (1928).

The Defendant seeks to support his position that Section 2 of Article 7477b is a valid and reasonable exercise of the police power on the theory that Section 2 acts only upon uncaptured water, which has no owner, or, if there is an owner, it is the common property of the State of Texas. To support this theory and his general position that under any view the statute is a reasonable exercise of the police power, the Defendant relies primarily upon Greer v. State of Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896); Hudson County Water Company v. McCarter, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908); Knight v. Grimes, supra, and Williams v. City of Wichita, supra.

In our opinion, none of the above cases presents sufficient authority for this court to disregard the holdings of the cases of Commonwealth of Pennsylvania v. State of West Virginia, and West v. Kansas Natural Gas Co., which are found to be controlling on the issue presented herein. Considering the statute in question only with regard to whether it regulates the transportation and use of water after it has been withdrawn from a well and becomes personal property, such statute constitutes an unreasonable burden upon and interference with interstate commerce. Moreover, on the facts of this case it appear to us that Section 2 of Article 7477b does not have for its purpose, nor does it operate to conserve water resources of the State of Texas except in the sense that it does so for her own benefit to the detriment of

her sister States as in the case of West v. Kansas Natural Gas Co. In the name of conservation, the statute seeks to prohibit interstate shipments of water while indulging in the substantial discrimination of permitting the unrestricted intrastate production and transportation of water between points within the State, no matter how distant; for example, from Wilbarger County to El Paso County, Texas. Obviously, the statute had little relation to the cause of conservation.

 Under the law of the State of Texas, a landowner has the right to drill wells and appropriate all the underground percolating waters found to his own purposes, and if, in the exercise of such right, he intercepts or drains off water from beneath his neighbor's land, this inconvenience to his neighbor falls within the description of damnum absque injuria, which cannot be the ground of an action. City of Corpus Christi v. City of Pleasanton, 154 Tex. 289, 276 S.W.2d 798 (1955), Houston & T. C. Ry. Co. v. East, 98 Tex. 146, 81 S.W. 279 (1904). This right to enter upon the land and appropriate underground percolating waters is an interest in real estate, and may be exercised by the landowner or made the subject of an independent grant of ownership. Evans v. Ropte, 128 Tex. 75, 96 S.W.2d 973 (1936). Further, after the water has been appropriated, the landowner, his lessee or assign, has the right to sell the water to others for use off of the land and outside the basin where produced, just as he could sell any other species of property. City of Corpus Christi v. City of Pleasanton, 154 Tex. 289, 276 S.W.2d at 802 (1955); Pecos County Water Control & Improvement Dist. No. 1 v. Williams, 271 S.W.2d 503, 505 (Tex.Civ.App.1954, err. ref. n. r. e.); Texas Co. v. Burkett, 117 Tex. 16,

296 S.W. 273, 278, 54 A.L.R. 1397 (1927). These rights, although not codified, have been generally recognized by statute as property rights of sufficient character for ownership. Art. 7880–3c, subsection D, Vernon's Ann.Tex.Civ.Stats. and Art. 7477b, Section 7, Vernon's Ann.Tex.Civ. Stats.[15] Thus, except for Section 2 of Article 7477b, the general law of the State of Texas, which recognizes water that has been withdrawn from underground sources as personal property subject to sale and commerce, would allow the Plaintiffs to withdraw water from the Mock's land and transport same to the City of Altus.

This statute, however, seeks to prohibit the production of underground water for the purpose of transporting same in interstate commerce, and has the effect of prohibiting the interstate transportation of such water after it has become personal property. Whether a statute by its phraseology prohibits the interstate transportation of an article of commerce after it has become the personal property of someone as in the Pennsylvania and West cases, or prohibits the withdrawal of such substance where the intent is to transport such in interstate commerce, the result upon interstate commerce is the same. In both situations, the purpose and intent of the statute and the end result thereof is to prohibit the interstate transportation of an article of commerce. Clearly, then, Section 2 of this statute constitutes an unreasonable burden upon interstate commerce. Plaintiffs should not be denied by the provisions of such statute the right to withdraw and move water in interstate commerce.

The relief prayed for by the Plaintiffs is in all things granted, and judgment will be entered accordingly.

15. Article 7880–3c, subsection D, provides: "The ownership and rights of the owner of the land, his lessees and assigns, in underground water are hereby recognized, and nothing in this Section 3c shall be construed as depriving or divesting such owner, his assigns or lessees, of such ownership or rights, subject, however to the rules and regulations promulgated pursuant to this Section 3c." The above is incorporated almost verbatim in Section 7 of Article 7477b.