Jeris A. Danielson State Engineer Division of Water Resources 1313 Sherman Street, Rm. 818 Denver, CO 80203
Dear Dr. Danielson:
This opinion letter is in response to your letter of July 24, 1985, in which you inquired about the application of House bill 1070, section 6, which amends article 81 of title 37, Colorado Revised Statutes to add a new section 37-81-104 that authorizes a fee of $50 per acre-foot to be assessed and collected by the state engineer on water exported from Colorado.
QUESTION PRESENTED AND CONCLUSION
Your request for an attorney general's opinion presents the question:
To what exports of water does the following statutory provision apply?
 To effectuate the purposes of this article, the general assembly hereby authorizes a fee of fifty dollars per acre-foot to be assessed and collected by the state engineer on water diverted, carried, stored, or transported in this state for beneficial use outside this state measured at the point of release from storage or at the point of diversion.
House bill 1070, § 6 (May 23, 1985) (to be codified at section37-81-104(1), C.R.S.) (hereinafter cited as section 37-81-104(1)).
My conclusion is that the above fee cannot be assessed on any water exported from Colorado because: (1) Colorado is not entitled to impose a fee on any export that is authorized by an interstate compact or judicial decree or is credited as a delivery by Colorado to another state pursuant to a compact or decree; and (2) in any event, such an export fee violates the Commerce Clause, art. I, § 8, cl. 3 of the United States Constitution.
ANALYSIS
a. Can Colorado impose a fee on water exports that areauthorized by an interstate compact or judicial decreeor are credited as deliveries by Colorado to anotherstate pursuant to a compact or decree?
Colorado is bound by nine interstate compacts [1] and two United States Supreme Court decrees [2] that equitably apportion the waters of interstate streams. "Equitable apportionment is the doctrine of federal common law" developed by the United States Supreme Court in Kansas v.Colorado, 206 U.S. 46 (1907), and succeeding cases, "that governs disputes between States concerning their rights to use the water of an interstate stream." Colorado v. NewMexico, 459 U.S. 176, 183 (1982) (hereinafter cited asColorado v. New Mexico I). The doctrine is based on equality of right among states. It does not require that the waters of an interstate stream be divided equally among the states through which it flows, but that the states be treated as equals, whose competing interests must be reconciled, taking into consideration the laws of the states and all other relevant facts. See, e.g., Connecticut v.Massachusetts, 282 U.S. 660, 670-671 (1931). The apportionment is truly equitable, based on an individualized weighing of the equities in the particular case. See,e.g., Colorado v. New Mexico I, 459 U.S. 176;Kansas v. Colorado, 206 U.S. 46.
In Kansas v. Colorado, Colorado argued that, as the upper state, it was entitled to use all the waters of the Arkansas River flowing within its boundaries, regardless of injury to Kansas. The Supreme Court rejected that argument. Colorado made the same contention in Wyoming v.Colorado, 259 U.S. 419 (1922), and, again, the court rejected it, saying, "The river, throughout its course in both states, is but a single stream wherein each State has an interest which should be respected by the other." Id. at 466. More recently, in Colorado v. New Mexico I,459 U.S. at 181 n. 8, and Colorado v. New Mexico, 104 S.Ct. 2433,2442 (1984) (hereinafter cited as Colorado v. New MexicoII), the United States Supreme Court stated that the "mere fact" that a river originates in a state does not automatically entitle a state to a share of the water. In Colorado v. NewMexico II, in which the Court held that Colorado was not entitled to an equitable apportionment of the waters of the Vermejo River for its proposed future uses, the Court stated that "the equitable apportionment of appropriated rights should turn on the benefits, harms, and efficiencies of competing uses, and . . . the source of the Vermejo River's waters should be essentially irrelevant to the adjudication of these sovereigns' competing claims." 104 S.Ct. at 2442.
It is clear from the above cases that Colorado is not
entitled to assert a superior claim to all the waters of an interstate stream that flow through the state simply because the waters originate in Colorado and Colorado can physically cut off the flow to downstream states. It follows from this that, under federal common law, Colorado has no right to charge another state, or its water users, a fee for the delivery of that state's equitable share of water. Therefore, no fee can be charged for any water delivered to another state pursuant to a court decree equitably apportioning the waters of an interstate stream.
The same result obtains for water delivered to another state pursuant to an interstate compact. Interstate compacts are agreements between states, ratified by Congress, that allocate the waters of interstate streams. Such compacts are intended to make an equitable apportionment by consent, rather than litigation. See, e.g., the Colorado River Compact, section 37-61-101, art. I, C.R.S. (1973); the Arkansas River Compact, section 37-69-101, art. I, C.R.S. (1973). Since interstate compacts purport to equitably divide the waters of interstate streams, it would be inconsistent with the underlying common law doctrine, as well as a probable violation of the compact, for one signatory state to seek to charge another signatory state, or its water users, for water that the first state was obligated to deliver.
This may seem self-evident as to waters that flow out of Colorado in a natural stream channel, but it is equally true for water that is diverted before it leaves the state, if the delivery of water to another state is expressly authorized by compact or otherwise credited as a compact delivery by Colorado. For example, the South Platte River Compact, section 37-65-101, art. V, para. 1, C.R.S. (1973), recognizes that certain canals carry water for the irrigation of lands in Nebraska. Paragraph 2 expressly protects those uses:
 Colorado waives any objection to the delivery of water for irrigation of lands in Nebraska by the canals mentioned in paragraph one (1) of this Article, and agrees that all interests in said canals and the use of waters carried thereby, now or hereafter acquired by owners of lands in Nebraska, shall be afforded the same recognition and protection as are the interests of similar land owners served by said canals within Colorado. . . .
For Colorado to assess a fee on water delivered to Nebraska by those canals when no fee was assessed on Colorado uses would violate this compact provision. See also section37-65-101, art. VI. Other compacts contain similar provisions.See, e.g., the Republican River Compact, section 37-67-101, art. V, C.R.S. (1973); the Arkansas River Compact, section 37-69-101, art. VI, para. B, C.R.S. (1973).
There may also be circumstances where the delivery of water for use in another state, although not expressly authorized by an interstate compact or judicial decree, is credited as a delivery to the other state by Colorado. Colorado's export statute, article 81 of title 37, C.R.S. (1973), requires this in many situations. Under the 1983 amendments to article 81, it is unlawful for any person to export water from Colorado without first obtaining approval from a water judge, the state engineer, or the ground water commission, as appropriate. See
section 37-81-101(1)(b) and (2), C.R.S. (1984 Supp.). If the water to be exported is part of an interstate stream system and the water is to be transported into or through a state through which that stream system flows, for use in that state, that amount of water must be credited as a delivery to that state by Colorado for purposes of any compact or court decree, or else the export shall not be approved. Section 37-81-103(1), C.R.S. (1984 Supp.). The burden is upon the person seeking to export water to prove that Colorado will be given credit for the delivery. Section 37-81-103(2), C.R.S. (1984 Supp.).
For the reasons set forth above, I conclude that, since federal common law precludes Colorado from charging for the delivery of another state's equitable share of the waters of an interstate stream, Colorado may not impose a fee on water exported from the state which is authorized by an interstate compact or judicial decree or is credited as a delivery by Colorado to another state pursuant to a compact or decree. Consequently, section37-81-104(1) cannot lawfully be applied to such compacted or decreed waters.
b. Does the imposition of an export fee by Colorado violatethe Commerce Clause of the United StatesConstitution?
In light of my answer to the first question posed, I do not know if there is or will be water exported from Colorado that is neither authorized by an interstate compact or judicial decree nor credited as a delivery by Colorado to another state pursuant to a compact or decree, and so is subject to the imposition of a fee under section 37-81-104(1). However, the possibility exists that such an export could be approved pursuant to section37-81-101(3), C.R.S. (1984 Supp.), if the water to be transported out of state is not part of or hydraulically connected to a stream system that is subject to a compact or decree (e.g., certain ground water), or is destined for use in an out-of-basin state that does not have an equitable claim to the waters of the stream system. Therefore, a second question must be addressed: does that portion of House bill 1070 that assesses a fee on water transported for beneficial use outside the state offend the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, by imposing an impermissible burden on interstate commerce?
The Commerce Clause empowers Congress to regulate commerce among the states. The purpose of the Commerce Clause is to ensure that "our economic unit is the Nation"; the "corollary" of this principle is "that the states are not separable economic units."Philadelphia v. New Jersey, 437 U.S. 617, 623 (1978) (quoting H.P. Hood Sons, Inc. v. Du Mond, 336 U.S. 525,537-538 (1949)). Accordingly, the Commerce Clause has been interpreted by the Supreme Court "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." Hughes v. Oklahoma, 441 U.S. 322,326 (1979). This limitation on state regulation of interstate commerce that the Commerce Clause has been held to impose is commonly referred to in terms of the negative implications of the Commerce Clause.
The United States Supreme Court has applied two different standards in determining the validity of state legislation that burdens interstate commerce. If the challenged statute applies evenhandedly to both in-state and out-of-state commerce and its effects on interstate commerce are only incidental, the Court has applied a flexible test that balances the local interest against the incidental burden on commerce in determining the law's validity. Pike v. Bruce Church, Inc., 397 U.S. 137,142 (1970), cited with approval in Hughes v.Oklahoma, 441 U.S. at 331. However, if the statute discriminates against interstate trade, the Court has applied a very different test; if the facially discriminatory statute is not per se invalid, it is, at a minimum, subject to the "strictest scrutiny." Hughes v. Oklahoma,441 U.S. at 337.
The Court has repeatedly struck down protectionist statutes that sought to conserve scarce natural resources for the use of a state's own inhabitants. In West v. Kansas Natural GasCompany, 221 U.S. 229 (1910), the Court invalidated an Oklahoma statute that prevented the interstate transfer of natural gas produced within the state. Similarly, inPennsylvania v. West Virginia, 262 U.S. 553
(1923), the Court invalidated a West Virginia statute that gave a preference to its own citizens in the purchase of natural gas produced in the state. "These cases stand for the basic principle that a `State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State.'"Philadelphia v. New Jersey, 437 U.S. at 627 (quotingFoster-Fountain Packing Company v. Haydel, 278 U.S. 1,10 (1928)).
In subsequent Commerce Clause challenges to state regulation of exports of natural resources, the analysis employed in the early natural gas cases emerged as the "dominant approach."Hughes v. Oklahoma, 441 U.S. at 330.[3] InPhiladelphia v. New Jersey, 437 U.S. 617, the scarce natural resource involved was New Jersey's remaining landfill space. To conserve that space, the New Jersey statute in question prohibited the importation of most solid or liquid waste that originated or was collected outside the state. The Court recognized the different standards of review for protectionist statutes and statutes having a legitimate purpose that only incidentally burden commerce: "where simple economic protectionism is effected by state legislation, a virtuallyper se rule of invalidity has been erected. . . . The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders."Id. at 624 (citations omitted). The "crucial inquiry," said the Court, was whether the statute was basically a "protectionist measure" or a "law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." Id. The Court concluded that the law was protectionist because, rather than dealing with all waste, it discriminated against waste coming from outside the state. The Court struck down the statute, stating that one state could not attempt "to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade."Id. at 628.
Hughes v. Oklahoma, 441 U.S. 322, involved an Oklahoma statute that prohibited the transportation of natural minnows out of the state for purposes of sale. The Supreme Court found that the law on its face discriminated against interstate commerce. The Court then elaborated on the "per se rule of invalidity" language of Philadelphia v. New Jersey, stating, "Such facial discrimination by itself may be a fatal defect, regardless of the State's purpose, because `the evil of protectionism can reside in legislative means as well as legislative ends.' . . . At a minimum such facialdiscrimination invokes the strictest scrutiny of anypurported legitimate local purpose and the absence ofnondiscriminatory alternatives." Id. at 337 (emphasis added) (quoting in part Philadelphia v.New Jersey, 437 U.S. at 626). The Court found that the state had not chosen the least discriminatory alternative and held the law unconstitutional.
Until the Supreme Court decided Sporhase v. Nebraska,458 U.S. 941 (1982), there was some question as to whether these same principles would be applied to state regulation of the exportation of water.[4] Sporhase involved a challenge to a Nebraska law that restricted the withdrawal and transport of Nebraska ground water for use in an adjoining state, brought by an irrigator who had been enjoined from using Nebraska water in Colorado. The first three conditions for an interstate transfer were "that the withdrawal of the ground water requested is reasonable, is not contrary to the conservation and use of ground water, and is not otherwise detrimental to the public welfare." Id. at 944. The final condition was that "the state in which the water is to be used grants reciprocal rights to withdraw and transport ground water from that state for use in the State of Nebraska." Id.
The Supreme Court concluded, as a threshold matter, that ground water is an article of commerce, to which the negative implications of the Commerce Clause apply. The Court then upheld the first three conditions because they advanced the state's interest in conservation and preservation of ground water, because there were similar limitations upon intrastate transfers, and because the Court was "reluctant to condemn as unreasonable, measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage."Id. at 956. The Court took a different view of the reciprocity requirement, noting that, since Colorado law then forbade the exportation of ground water, it operated as an explicit barrier to commerce between the two states. The Court stated that Nebraska "bears the initial burden of demonstrating a close fit between the reciprocity requirement and its asserted local purpose." Id. at 957. The Court then ruled that Nebraska had failed to meet its burden of proof because there was "no evidence that this restriction is narrowly tailored to the conservation and preservation rationale." Id. at 957-958.
The Court concluded:
 We therefore are not persuaded that the reciprocity requirement — when superimposed on the first three restrictions in the statute — significantly advances the State's legitimate conservation and preservation interest; it surely is not narrowly tailored to serve that purpose. The reciprocity requirement does not survive the "strictest scrutiny" reserved for facially discriminatory legislation. Hughes v. Oklahoma, supra, at 337.
Id. at 958 (emphasis added). After determining that Congress had not authorized the states to impose otherwise impermissible burdens on interstate commerce in ground water, the Court held that the reciprocity requirement of the Nebraska statute violated the Commerce Clause.
While Sporhase and the other natural resources cases discussed above involved laws that restricted interstate commerce, Commonwealth Edison Company v.Montana, 453 U.S. 609 (1981), was a challenge to the State of Montana's severance tax on all coal mined in the state. The Court applied a four-part test, previously articulated inComplete Auto Transit, Inc. v. Brady,430 U.S. 274 (1977), to determine the validity of the Montana severance tax. "Under that test, a state tax does not offend the Commerce Clause if it `is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned,does not discriminate against interstatecommerce, and is fairly related to services provided by the State.' 430 U.S. at 279." Commonwealth Edison Company v.Montana, 453 U.S. at 617 (emphasis added). The Montana severance tax was computed at the same rate regardless of the final destination of the coal, but, because 90 percent of Montana coal is shipped to other states, the plaintiff coal producers and out-of-state utility companies argued that the tax discriminated against interstate commerce. The Supreme Court disagreed and upheld the tax stating that it was not "the type of differential tax treatment of interstate and intrastate commerce that the court has found in other `discrimination' cases."Id. at 618 (citing, inter alia,Philadelphia v. New Jersey, 437 U.S. 617).
There is no question that section 37-81-104(1) on its face discriminates against interstate commerce, since the $50 per acre-foot fee is not a charge on all water diverted, carried, stored, or transported in Colorado, but is only imposed on water to be used outside the state. Therefore, under thePhiladelphia v. New Jersey — Hughes
— Sporhase line of cases, the statute can be upheld only if it satisfies the "strictest scrutiny."
The Court in Sporhase indicated that it is reluctant to condemn measures taken by a state to conserve and preserve its water resources for a number of reasons: first, a state's power to regulate the use of water in times and places of shortage to protect "the health of its citizens — and not simply the health of its economy — is at the core of its police power"; second, the legal expectation that under certain circumstances each state may restrict water within its borders has been fostered over the years by the Supreme Court's equitable apportionment decrees and by the negotiation and enforcement of interstate compacts; third, a state's claim to public ownership of its waters may support a limited preference for its own citizens; and, fourth, a state's conservation measures which keep water available may give water some indicia of a good publicly produced and owned in which a state may favor its own citizens in times of shortage. Id. at 956-957. While these reasons contributed to the Court's concluding that the three conservation and preservation conditions of the Nebraska statute were constitutional, they were not sufficient to save the reciprocity requirement. The Court stated that the reciprocity requirement could stand only if the state proved that it was narrowly tailored to the conservation and preservation rationale, as by showing that the state as a whole suffered from a water shortage, that the intrastate transportation of water from areas of abundance to areas of shortage was feasible regardless of distance, and that the importation of water from adjoining states would roughly compensate for any exportation to those states. The Court went so far as to say, "A demonstrably arid State conceivably might be able to marshal evidence to establish a close means — end relationship between even a total ban on the exportation of water and a purpose to conserve and preserve water." Id. at 958.
I conclude that Colorado cannot meet this burden for the export fee provision. Section 37-81-104(1) states that the fee is authorized to effectuate the purposes of article 81. Section37-81-101(1), C.R.S. (1984 Supp.), sets forth Colorado's purposes in restricting the export of water:
 (1) (a) The general assembly hereby finds and declares that the location and availability of water in this state varies greatly from place to place and that the state as a whole suffers a shortage of water. The general assembly further recognizes that because of Colorado's unique location at the headwaters of four of the nation's major western rivers and because all the major river systems in Colorado flow out of the state, and that in order to insure the availability of these scarce water resources for the use of citizens of the state of Colorado, compacts have been entered into with the downstream states on all the major rivers originating in Colorado.
 (b) It is also recognized that it has been the continuing historical policy of the state of Colorado to conserve and prevent waste of its water resources to provide adequate supplies of water necessary to insure the continued health, welfare, and safety of all of its citizens. Accordingly, the general assembly hereby determines that, for the purpose of conserving the scarce water resources of this state and to thereby insure the continuing health, welfare, and safety of the citizens of this state,. . . .
The proffered justification bears a close relationship to the criteria for approving exports set forth in sections 37-81-101(3) and 37-81-103, C.R.S. (1984 Supp.), which relate to the protection of Colorado's rights and the satisfaction of its obligations under interstate compacts or judicial decrees and the conservation of water resources. These are interests for which the Supreme Court has expressed sympathy. Sporhase v.Nebraska, 458 U.S. at 956-957.[5] The imposition of a fee on exports, on the other hand, is not narrowly tailored to these equitable apportionment and conservation purposes and is certainly not the least discriminatory means to achieve them.See Hughes v. California, 441 U.S. at 337. When section 37-81-104 is superimposed on the other limitations contained in sections 37-81-101(3) and 37-81-103, it does not appear that the imposition of an export fee adds anything to those provisions that "significantly advances the state's legitimate conservation and preservation interest. . . ."Sporhase v. Nebraska, 458 U.S. at 958. The statute also suffers from the same defect that was condemned inPhiladelphia v. New Jersey, 437 U.S. at 628 — it imposes the full burden of conserving the scarce natural resource on out-of-state interests. Finally, it is unclear, in light ofCommonwealth Edison Company v. Montana, 453 U.S. 609, and the Complete Auto Transit test applied therein, that any fee that on its face discriminates against interstate commerce, no matter what its justification, can withstand constitutional scrutiny.
SUMMARY
You have asked to what exports of water the fee of $50 per acre-foot applies. I conclude that the fee cannot lawfully be assessed on any water exported from Colorado. First, Colorado is not entitled to impose a fee on any exports that are authorized by an interstate compact or judicial decree or are credited as a delivery by Colorado to another state pursuant to a compact or decree. Second, the imposition of a fee on water diverted, carried, stored, or transported in Colorado for use outside the state, when no fee is charged for use within the state, would violate the Commerce Clause of the United States Constitution.
Very truly yours,
 DUANE WOODARD Attorney General
WATER AND WATERWAYS INTERSTATE COMMERCE FEES TAXATION AND REVENUE
H.B. 1070, § 6 (May 23, 1985)
NATURAL RESOURCES Engineer St. Wtr Resources
Application of water export fee authorized by House Bill 1070, § 6 (May 23, 1985) (to be codified at section 37-81-104, C.R.S.).
[1] The Colorado River Compact, sections 37-61-101 through 104, C.R.S. (1973); the Upper Colorado River Compact, sections 37-62-101
through 106, C.R.S. (1973); the La Plata River Compact, sections 37-63-101 through 102, C.R.S. (1973); the Animas-La Plata Project Compact, section 37-64-101, C.R.S. (1973); the South Platte River Compact, section 37-65-101, C.R.S. (1973); the Rio Grande River Compact, sections 37-66-101 through 102, C.R.S. (1973); the Republican River Compact, sections 37-67-101 through 102, C.R.S. (1973); the Amended Costilla Creek Compact, sections37-68-101 through 102, C.R.S. (1973); and the Arkansas River Compact, sections 37-69-101 through 106, C.R.S. (1973).
[2] Nebraska v. Wyoming, 325 U.S. 589 (1945);Wyoming v. Colorado, 353 U.S. 953 (1957)vacating 260 U.S. 1 (1922) (former decree vacated by consent of the parties). In Colorado v. New Mexico,104 S.Ct. 2433 (1984), the Supreme Court denied Colorado's claim that it was entitled to an equitable share of the water of the Vermejo River, in effect, allocating all the water to New Mexico.
[3] Hughes overruled the early case of Geer v.Connecticut, 161 U.S. 519 (1896), which sustained a Connecticut prohibition against the interstate transportation of game birds taken in the state on the theory that the state owned its wild animals and, therefore, was free to qualify any ownership interest it might recognize in those who captured them. The Supreme Court relied on the public ownership theory in deciding Hudson County Water Company v.McCarter, 209 U.S. 349 (1908), discussed in note 4,infra.
[4] In Hudson County Water Company v. McCarter,209 U.S. 349 (1908), the Supreme Court upheld a New Jersey statute that prohibited the interstate transfer of any surface water located in the state. The continuing viability of HudsonCounty was much mooted until Sporhase, which appears to have laid that case to rest. The Court inSporhase noted that the basis for decision of the Commerce Clause issue in Hudson County was the public ownership theory enunciated in Geer v. Connecticut,161 U.S. 519 (1896), and that Geer had been expressly overruled. See note 3, supra. The Court also observed that Hudson County was inconsistent with the Court's summary affirmance of a three-judge district court judgment in City of Altus v. Carr,255 F. Supp. 828 (W.D. Tex.), aff'd mem., 385 U.S. 35 (1966).
[5] In a recently decided case, the Ninth Circuit Court of Appeals upheld the Yellowstone River Compact's restriction on interbasin or interstate transfers of Yellowstone River water. The court held that, by approving the compact, Congress has converted it into federal law and, thereby, immunized it from Commerce Clause attack. Intake Water Company v.Yellowstone River Compact Commission, No. 84-3895 (9th Cir. Aug. 20, 1985).